The CITY OF ROME, NEW YORK,
Plaintiff–Appellant,

v.

VERIZON COMMUNICATIONS INC., Defendant–Appellee.

Docket No. 03–7195.

United States Court of Appeals, Second Circuit.

Argued: Nov. 3, 2003.

Decided: March 25, 2004.

---

James S. Rizzo, Corporation Counsel, for Plaintiff–Appellant City of Rome, Rome, New York.

Andrew G. McBride, Wiley Rein & Fielding LLP (Helgi C. Walker and Eve Klindera Reed, of counsel), for Defendant–Appellee Verizon Communications Inc., Washington, D.C.

Henry W. Underhill, Jr. (Lani L. Williams, of counsel), for amici curiae The International Municipal Lawyers Associa-

tion, The National League of Cities, The National Association of Telecommunications Officers and Advisors, The National Association of Counties, The United States Conference of Mayors, and The New York State Conference of Mayors, Washington, D.C.

Before: McLAUGHLIN and KATZMANN, Circuit Judges, SCHEINDLIN, District Judge [1].

Judge SCHEINDLIN dissents in a separate opinion.

KATZMANN, Circuit Judge.

This case calls upon us to examine the interplay of local, state, and federal laws as they affect the authority of a city to negotiate franchise agreements with telecommunications companies. More specifically, we decide to what extent, if any, Section 253 of the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, confers federal jurisdiction upon cases implicating it that are initially brought in state court. Plaintiff appeals from a decision and order of the United States District Court for the Northern District of New York (Hurd, *J.*) granting summary judgment to defendant Verizon Communications Inc., on the ground that the Telecommunications Act preempted the franchise agreement that the City of Rome sought to compel Verizon to negotiate. For the reasons articulated below, we vacate the district court's decision for lack of subject matter jurisdiction and remand the district court with instructions to return the case to state court.

## I. Background

The late nineteenth and early twentieth centuries witnessed a period of substantial growth in telephone usage and the dissemination of telephone service throughout not only the more populous parts of the United States but rural areas as well. *See* Claude S. Fischer, *America Calling: A Social History of the Telephone to 1940*, at 86–121 (1992). With this expansion arrived new laws governing the relation between localities and telephone service providers. *Id.* at 123 ("Telephone men needed town governments' permission to conduct business, plant poles, and to string wire across streets. In return, the companies often provided free telephone service for City Hall, agreed to put caps on rates, and sometimes paid bribes."). States also entered into the enterprise, some assuming control over telephone regulation by setting up new state-wide agencies. *See id.* at 134 (explaining how "[t]he establishment of the California Public Utilities Commission in 1911 soon usurped ... regulatory powers from the town, thereby defusing most local controversies about telephony").

New York was not exempt from this telephonic and legislative turmoil. Under Section 27 of the New York Transportation Corporations Law ("TCL"), the slightly modified descendent of a 1909 statute, a telephone or telegraph corporation may construct and maintain fixtures for its lines under the city streets, "provided that such corporation shall, before laying any such line in any city ... of this state, first obtain from the common council of cities, or other body having like jurisdiction therein ... permission to use the streets within such city, village or town for the purposes herein set forth." N.Y. Trans. Corp. Law § 27. In May of 1912, the common council of the City of Rome (the "City") adopted an ordinance permitting the New York Telephone Company (the "Company") and its successors and assigns

**1.** The Honorable Shira A. Scheindlin, of the United States District Court for the Southern District of New York, sitting by designation.

to lay and maintain lines on three streets within the City's boundaries. The ordinance set forth certain conditions for the grant, requiring the Company to execute and deliver a $10,000 bond to indemnify the City against any claims for damages arising out of construction activities, mandating that the Company permit the City to use its underground conduits, directing that the operations be conducted under the supervision of the City's Board of Public Works, and providing that the rights to build would be forfeited unless exercised by 1922. The Company agreed to these terms in an acceptance dated May 31, 1912. Thirty years later, in 1942, the City granted a permit pursuant to Section 27 of the TCL allowing the Company to "construct, reconstruct, reinforce, operate, maintain and repair underground conduits . . . [and] from time to time to construct, lay and use lines of electrical conductors . . . in, on, along, under and across all of the various streets, roads, avenues and highways, or parts thereof, in the City of Rome . . . excepting the Corporation Tax District. . . ." Permit issued by Rome to the Company under § 149 of the Highway Law (Jan. 14, 1942).

In the interim, New York State, in 1913, enacted legislation limiting the duration of franchises, N.Y. Gen. City Law § 23(2)(b), and, in 1921, incorporated this alteration into the City's Charter. Laws of New York 1921, chap. 679, sec. 33. Section 33 of the law that continues to serve as the City's Charter specifies that:

> No franchise shall be granted or be operated for a period longer than fifty years. The common council may, however, grant to the owner or lessees of an existing franchise, under which operations are being carried on, such additional rights or extensions in the street or streets in which the said franchise exists, upon such terms as the interest of the city may require . . . .

*Id.* This provision formed the backdrop for the City's enactment, in 1949, of an additional ordinance that expanded the 1912 grant while continuing to impose similar requirements upon the Company.

Much later in the century, Congress substantially altered the landscape of telephone and cable services with the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56, designed to broaden the range of providers given access to the market while at the same time permitting states and localities to retain some control over their relations with telecommunications companies.

In May of 2001, the City contacted Verizon Communications Inc. ["Verizon"], the parent company of New York Telephone's successor, claiming that its 1949 franchise had expired in 1999, and that Verizon thus bore an obligation to commence negotiations with the City to renew its franchise. Letter from Rome to Verizon of May 17, 2001. Rome had already negotiated such agreements with several other telecommunications providers, including Adelphia Business Solutions and Fibertech Networks, L.L.C. A lengthy and contentious correspondence ensued between Verizon and the City. During this exchange, Verizon maintained that the original franchise, once granted, had become "a vested, indefeasible property right" of the franchisee, and, furthermore, that Section 253 of the Federal Telecommunications Act of 1996 limited municipalities' authority to manage their rights-of-way through franchising. Letter from Verizon to Rome of June 5, 2001. The City continued to insist upon its rights under state and local laws and responded that nothing in the Telecommunications Act would bar it from obtaining "reasonable compensation" for the use of its rights-of-way. Letter from Rome to Verizon of June 25, 2001. Rome also threatened to bar Verizon from accessing its facilities unless the Company agreed to

commence negotiations. Letter from Rome to Verizon of Sept. 28, 2001.

Rather than resorting to such extreme action when its efforts to compel negotiations proved unsuccessful, the City instead brought suit against Verizon in state court in March, 2002. The City sought a "declaration of the rights of the parties with respect to the need to renegotiate and renew the Franchise previously obtained by Defendant by virtue of being a successor-in-interest to the Original Grantee." Compl. Verizon promptly removed the case to federal court, claiming that "[t]he adjudication of [Rome's] state law claims turns entirely on the resolution of several important questions of federal law." Notice of Removal ¶ 6.

The City did not attempt to remand, and the district court assumed jurisdiction. Verizon then moved to dismiss. After the parties submitted materials outside of the pleadings, including examples of the franchise agreements that the City had negotiated with other telecommunications providers, the district court converted Verizon's motion into one for summary judgment. Among the terms of the franchise agreements Rome provided were specifications for the placement of underground lines and the location of poles, a clause requiring that the companies carry liability insurance to indemnify the City, a provision limiting assignments of the franchise, and a section imposing fees—including a "right-of-way" fee amounting to four percent of the companies' annual gross revenues. On the basis of these documents, the district court ruled in favor of Verizon.[2] *City of Rome v. Verizon Communications, Inc.*, 240 F.Supp.2d 176 (N.D.N.Y.2003). The court held that the City's agreement violated Section 253(a) of the Telecommunications Act because it had "the effect of prohibiting [Verizon] from providing interstate or intrastate telecommunications services," and decided, as a result, that Verizon "is under no obligation to negotiate with the City under the terms of the proposed Agreement." *Id.* at 181. This appeal followed.

## II. ANALYSIS

The basis for federal jurisdiction in this litigation is rather murky. Although the parties both consented to jurisdiction below, the fact that the City agreed to

---

**2.** There is some dispute about how susceptible to alteration the provisions included within the City's "standard franchise agreement" actually are. In an affidavit submitted in opposition to Verizon's motion to dismiss, Timothy Benedict, the Assistant Rome Corporation Counsel, asserted that the franchise agreements arrived at with Adelphia Business Solutions and Fibertech Networks, L.L.C. "embody the City's updated language and provisions relating to the use of its rights-of-way by telecommunications providers, and ... would substantially be the same [as the] form utilized between City and Defendant." Benedict Aff. ¶ 16. The district court then interpreted this "'standard' franchise agreement" as imposing inflexible conditions. *City of Rome v. Verizon Communications, Inc.*, 240 F.Supp.2d 176, 178 (N.D.N.Y.2003). On appeal, however, the City noted in its brief that:

> To address a possible misconception, the City, in its negotiations with Adelphia and Fibertech, presented each with a 'boilerplate' agreement, setting forth the basic parameters and provisions of the Franchise Agreement. The specifics of this 'boilerplate' were then negotiated with each company and the language modified accordingly. Therefore, the 'boiler-plate' is not to be considered a 'take it or leave it' proposition, as the City's policy has been to negotiate the language with each company wanting to do business in the City in a manner that ensures competitive neutrality and nondiscrimination.

Appellant's Brief at 8. We take seriously Rome's claim that the provisions are, in fact, negotiable, and that it is not employing the phrase "negotiate the franchise agreement" as simply a euphemism for "impose the franchise agreement."

litigate against Verizon in federal court does not clear away all jurisdictional impediments. As we have often observed, "it is well settled that lack of federal jurisdiction may be raised for the first time on appeal, even by a party who originally asserted that jurisdiction existed, or by the Court *sua sponte.*" *United States v. Leon,* 203 F.3d 162, 164 n. 2 (2d Cir.2000) (quoting *United States v. Heyward–Robinson Co.,* 430 F.2d 1077, 1080 (2d Cir.1970)). In this case, *amici curiae,* including the International Municipal Lawyers Association and the National League of Cities, argued in their brief to this Court that the district court lacked subject matter jurisdiction and that, therefore, the appeal should be dismissed and the case remanded to state court. Although Rome in part adopted *amici*'s stance in its subsequent letter briefing, the City also urged us, for the sake of judicial economy, to resolve the relevant Telecommunications Act issues and certify the state law questions to the New York Court of Appeals in order to ensure a prompt disposition of the case. Because we agree that federal jurisdiction does not lie, we decline to reach the merits, and instead remand to the district court with instructions to remand the case to state court.

■ The text and legislative history of Section 253 of the Telecommunications Act indicate that Congress intended to retain a sphere in which states and localities could negotiate and make agreements with telecommunications companies without being automatically subject to federal jurisdiction. This aspect of the legislative scheme

is particularly relevant where, as in the case before us, the state or locality refers *only* to state and local law in its complaint brought in state court. Under the Act, a telecommunications company bears the burden of challenging state and local legislation that does not conform with Section 253; such an entity cannot, however, merely by raising the specter of nonconformity, automatically remove cases involving state or local law to federal court.

In order to resolve the threshold issue of jurisdiction, we look first to the City's complaint and ascertain whether it comprehends a federal cause of action. *See* 28 U.S.C. § 1441(c). If it does not, we must then inquire as to whether the case falls within an exception to the well-pleaded complaint rule, that of federal preemption, and ask whether the Telecommunications Act completely preempts state and local law. Even if the Act should not be construed as resulting in complete preemption, we may, under certain conditions, constructively amend the complaint to assert federal claims.

■ As the Supreme Court has repeatedly reaffirmed, most recently in *Beneficial National Bank v. Anderson,* 539 U.S. 1, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003), we must, in assessing whether federal question jurisdiction lies, ask if the well-pleaded complaint asserts a federal claim on its face. *Id.* at 2062. The mere existence or invocation of a federal defense does not furnish a sufficient basis for jurisdiction to attach. *Id.*[3] In this case, the

---

**3.** The dissent argues that the proper jurisdictional question to ask in a declaratory judgment action is whether the defendant, not the plaintiff, can assert a right to recover under federal law. Scheindlin Dissent 2–5. While this statement accurately describes those declaratory judgment actions in which plaintiffs attempt to forestall a coercive suit under fed-

eral law threatened by a defendant, it does not cover the entire terrain—nor could it, because it would thereby subsume the set of cases in which federal jurisdiction is *not* proper because "but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action." *Franchise Tax Bd. v. Constr.*

complaint referred only to state and local, not federal, law. As it stated, "Plaintiff City of Rome respectfully requests a judgment of this Court determining, construing and declaring the legal rights and liabilities of the parties hereto with respect to the Franchise granted to Defendant, pursuant to § 27 of the New York State Transportation Corporation Law and § 33 of the City of Rome Charter ...." [4] Compl.

*Laborers Vacation Trust,* 463 U.S. 1, 16, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

To understand the sets of cases subsumed under these two seemingly divergent principles, it is useful to recall the multiple purposes of the equitable relief that declaratory judgment actions provide. One such purpose is to release "potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure—or never." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1555 (9th Cir.1990) (quotation marks omitted). Another purpose, however, is to furnish a less formidable alternative to injunctive relief. *See Nat'l Audubon Soc'y v. Davis,* 307 F.3d 835, 847 (9th Cir. 2002) (citing *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), for the proposition that "the 1934 Declaratory Judgment Act was passed to provide a milder alternative to the injunction remedy") (internal quotation marks omitted). The coercive action implicated by a declaratory judgment suit will not, therefore, always be that of the defendant, but may instead be that of the declaratory judgment plaintiff. In the latter case, a federal defense raised in response to the declaratory judgment action will not serve to confer federal jurisdiction.

The cases cited by the dissent only support this distinction. In *Hunter Douglas Inc. v. Sheet Metal Workers Int'l Assoc., Local 159,* the Fourth Circuit stated that "federal jurisdiction in an action for a declaratory judgment is determined by the character of the threatened action, *and not of the defense asserted,*" 714 F.2d 342, 345 (4th Cir.1983) (italics added). In a case to which *Hunter Douglas* referred, *id.,* the court asserted even more clearly that "it is well established that a declaratory judgment action seeking to establish the invalidity of a threatened claim based on federal law 'arises under' federal law, while a declaratory judgment action seeking to establish a federal defense to a threatened proceeding based on state law does not." *Arden–Mayfair, Inc. v. Louart Corp.,* 434 F.Supp. 580, 584 (D.C.Del.1977). Likewise, the Fifth Circuit, in *Lowe v. Ingalls Shipbuilding,* holding that federal jurisdiction *did not* lie, explained that "what must arise under federal law is the cause of action in issue itself (regardless of to whom it belongs) as distinguished from some defense to it," 723 F.2d 1173, 1179 (5th Cir.1984).

In this case, the City brought its action *not* to "precipitate [a] suit[ ] that otherwise might need to wait for the declaratory relief defendant to bring a coercive action," Scheindlin Dissent 4 (quoting the dissent in *Interstate Petroleum Corp. v. Morgan,* 249 F.3d 215 (4th Cir.2001) (en banc)), or receive a declaration that Verizon did not possess an affirmative right under the Telecommunications Act, but rather to force Verizon to negotiate a new franchise agreement. The underlying cause of action was, therefore, the City's request for a declaration of state and local law, pursuant to which it would be able to coerce Verizon into entering negotiations.

4. The only textual support for federal jurisdiction to which Verizon can point is furnished by a letter attached to the complaint that refers to the Telecommunications Act. Although such attachments are considered part of the complaint, Fed.R.Civ.P. 10(c), *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996), the context in which the City mentioned the Telecommunications Act reveals that its reference served only to rebut an anticipated defense. Verizon's June 5th letter to Rome had asserted, in opposition to the city's attempt to force it into negotiations, that "virtually all federal courts have found that under the Federal Telecommunications Act of 1996, municipalities like the City of Rome have very limited authority to manage the use of rights-of-way by telecommunications providers." Letter from Verizon to Rome of June 5, 2001. Verizon had then cited several circuit court cases in support of this proposition. The letter Rome attached to the complaint thus responded to Verizon's claim and citations by invoking the authority of federal as well as state law. As the relevant passage reads:

Further, state and federal law support the City's contention it may permit Verizon's

At oral argument and in its briefing, Verizon also asserted that, even if the complaint cannot be read as broadly as the company claims, the City's "right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." Appellee's Brief at 39. As Verizon's brief continues, "[a]ny declaration of the City's alleged rights under state law to force franchise renewal negotiations under pain of a denial of access to telecommunications facilities necessitates a threshold determination of the legality of such action under Section 253." *Id.* Verizon has, however, stretched the language upon which it relies—taken from the Supreme Court's opinion in *Franchise Tax Board*, 463 U.S. at 9, 103 S.Ct. 2841 [5]—far beyond the extent of its accepted applications. The Supreme Court itself, in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), cautioned that the seemingly expansive language of *Franchise Tax Board* should be read narrowly. *Merrell Dow*, 478 U.S. at 809, 106 S.Ct. 3229. When considering the petitioner's claim in *Merrell Dow* that federal question jurisdiction was appropriate because "it appear[ed] that some substantial, disputed question of federal law [was] a necessary element of one of the well-pleaded state claims," the Court emphasized that "*Franchise Tax Board* ... did not purport to disturb the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Id.* at 813, 106 S.Ct. 3229.

■ Furthermore, the Court has recently stated the exceptions to the well-pleaded complaint rule even more narrowly in *Beneficial National Bank*. As the Court asserted after reviewing its precedents—including *Franchise Tax Board*,—"a state claim may be removed to federal court in only two circumstances—when Congress expressly so provides, such as in the Price–Anderson Act [which deals with nuclear accidents] ... or when a federal statute wholly displaces the state-law cause of action through complete pre-emp-

use of the City's rights-of-way for the maintenance, repair and operation of lines and conduits underground within the City. Said contention is supported by both New York State Transportation Corporation Law § 27, which expressly requires the City's approval for said activity, and the Federal Telecommunications Act of 1996 § 253(c). Further, § 253(c) provides the City with the ability to obtain reasonable compensation for Verizon's utilization of the City's rights-of-way.

Letter from Rome to Verizon of June 25, 2001. This language indicates that the City's citation to the Telecommunications Act functioned primarily as a response to the defense that Verizon raised. Such an anticipatory rejoinder to a defense cannot, any more than a defense itself, provide the basis for federal question jurisdiction. *See Franchise Tax Bd.*, 463 U.S. at 10, 103 S.Ct. 2841 ("[A] federal court does not have original jurisdiction over a case in which the complaint presents a state-law cause of action, but also asserts that federal law deprives the defendant of a defense he may raise, or that a federal defense the defendant may raise is not sufficient to defeat the claim.") (internal citations omitted); *Gully v. First Nat'l Bank*, 299 U.S. 109, 113, 57 S.Ct. 96, 81 L.Ed. 70 (1936) ("[T]he complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense.").

5. The relevant passage of *Franchise Tax Board* reads: "We have often held that a case 'arose under' federal law where the vindication of a right under state law necessarily turned on some construction of federal law ...." *Franchise Tax Bd.*, 463 U.S. at 9, 103 S.Ct. 2841.

tion." *Beneficial Nat'l Bank,* 123 S.Ct. at 2063. Because Congress did not expressly provide for removal in this instance, we must look instead to whether Section 253 completely preempted state and local law. Before beginning this inquiry, it is worth noting that the Supreme Court has discerned a Congressional intent to accomplish complete preemption in only two statutes—the Labor–Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974. *See Beneficial Nat'l Bank,* 123 S.Ct. at 2063.

 Under *Beneficial National Bank,* we must undertake a two-step inquiry to determine first whether Section 253 preempts any common-law or state statutory rule and then whether Congress intended Section 253 to provide an exclusive cause of action. *Beneficial Nat'l Bank,* 123 S.Ct. at 2063–64. The language of the Act itself makes clear that Section 253 would preempt certain state or local ordinances. Entitled "Removal of barriers to entry," the Section reads:

(a) In general

No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

 If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253. Sub-section (d) clearly envisions that the FCC will preempt enforcement of any state or local statute that is inconsistent with sub-sections (a) and (b). Hence, if Verizon were indeed obliged to negotiate with the city under state or local law and the negotiation or the franchise agreement resulting from it violated sub-sections (a) or (b), the Commission could intervene to prevent implementation of such an objectionable agreement. However, under *Beneficial National Bank,* this possibility of preemption is not sufficient to establish federal jurisdiction as it would merely provide a complete federal defense to implementation of the state or local statutes. As Justice Stevens stated in analyzing the National Bank Act,

If, as petitioners asserted in their notice of removal, the interest that the bank charged to respondents did not violate § 85 limits, the statute unquestionably preempts any common-law or Alabama statutory rule that would treat those rates as usurious. The section would therefore provide the petitioners with a

complete federal defense. Such a federal defense, however, would not justify removal.

*Beneficial Nat'l Bank,* 123 S.Ct. at 2063.

We must therefore look at whether Congress intended Section 253 to provide an exclusive cause of action. *See Beneficial Nat'l Bank,* 123 S.Ct. at 2064. The terms of Section 253 as well as its legislative history suggest that Congress did not possess such an intent.[6] Sub-sections (b) and (c) clearly envision state and local regulation and rights-of-way management. As initially proposed, sub-part (d), which appeared only in the Senate version of the bill,[7] broadly specified that the Commission could preempt enforcement of any state or local laws merely inconsistent with Section 253, including those that fell within the scope of § 253(c). *See* 141 Cong. Rec. S8212 (daily ed. June 13, 1995) (statement of Sen. Slade Gorton, Republican–Washington State) (describing the sub-part as it then existed as stating that "[i]f, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates *or is inconsistent with* this section, the Commission *shall immediately preempt* the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency") (italics added). Several legislators, however, objected to the breadth of this preemption and suggested amendments restricting its compass. *See* 142 Cong. Rec. H1174 (daily ed. Feb. 1, 1996) (comments of Congresswoman Nancy Pelosi, Demo-

crat–California) (lauding the passage of such an amendment in the Senate); 142 Cong. Rec. S716 (daily ed. Feb. 1, 1996) (remarks of Sen. Diane Feinstein, Democrat–California). Senators Diane Feinstein and Dirk Kempthorne (Republican–Idaho) proposed to eliminate sub-part (d) and FCC preemption entirely. *See* 141 Cong. Rec. S8170–71 (daily ed. June 12, 1995) (statement of Sen. Feinstein). Although their amendment was defeated, Senator Gorton proposed a more limited alteration, which ultimately passed. *See* 141 Cong. Rec. S8308 (daily ed. June 14, 1995) (recording a vote of 56–44 against the Feinstein–Kempthorne amendment and a voice vote in favor of the Gorton revision); *see also* William Malone, *Access to Local Rights–of–Way: A Rebuttal,* 55 Fed. Comm. L.J. 251, 270 (2003). As Senator Gorton described the principal effects of his emendation: "The first is that it narrows the preemption by striking the phrase 'is inconsistent with' so that it now allows for a preemption only for a requirement that violates the section. And second, it changes it by limiting the preemption section to the first two subsections of new section 254;[8] that is, the general statement and the State control over utilities." 141 Cong. Rec. S8213 (daily ed. June 13, 1995). More specifically, Senator Gorton observed that, under the amendment,

[t]here is no preemption ... for subsection (c) which is entitled, 'Local Government Authority,' and which is the subsection which preserves to local gov-

---

6. We do not, in determining that Section 253 does not furnish an exclusive cause of action, decide whether or not Section 253(c) gives the City any cause of action, an issue that the parties did not brief or discuss at oral argument.

7. *See* S.Rep. No. 104–230, at 127 (observing that "The House provisions are identical or

similar to subsections ... (a), (b) and (c). The House amendment does not have a similar provision (d) requiring the Commission to preempt State or local barriers to entry, if it makes a determination that they have been erected.").

8. The "new section 254" to which he refers ultimately became Section 253.

ernments control over their public rights of way. It accepts the proposition from those two Senators [Feinstein and Gorton] that these local powers should be retained locally, that any challenge to them take place in the Federal district court in that locality and that the Federal Communications Commission not be able to preempt such actions.

*Id.* The Telecommunications Act as passed therefore refrained from militating FCC preemption of local determinations under Section 253(c).

By referring to the federal district court, Senator Gorton's comments raise the possibility that, while Congress may not have wished the FCC to preempt state and local laws, it may still have envisioned federal—and not state—courts adjudicating claims under Section 253. In several remarks, Senator Feinstein, like Senator Gorton, referred to the federal courts as providing a forum more desirable than the FCC. *See* 141 Cong. Rec. S8171 (daily ed. June 12, 1995) ("If the preemption provision remains, a city would be forced to challenge the FCC ruling to gain a fair hearing in Federal court. This is important because presently they can go directly to their local Federal court. Under the preemption, a city, State, or county government would have to come to the Federal court in Washington after an appeal to the FCC."). The absence of explicit references to state court jurisdiction, however, does not seem determinative because the context of the

legislators' comments—a protest against FCC preemption—made the relevant opposition that between FCC and all other jurisdictions rather than that between federal and state courts. Furthermore, the legislators' remarks were made against the backdrop of a strong presumption of concurrent state court jurisdiction over federal statutes. *See Yellow Freight Sys., Inc. v. Donnelly,* 494 U.S. 820, 823, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) (explaining the presumption of concurrent jurisdiction).[9] The legislative history thus does not suggest that Congress intended for Section 253 to provide an exclusive cause of action.

This conclusion finds support in other passages from the legislative history that indicate Congress intended municipalities to possess some latitude in deciding how to manage their rights of way and determining what constitutes reasonable compensation. As Senator Feinstein argued in support of the amendment that she and Senator Kempthorne had sponsored, "[W]hen it comes to the rights-of-way and what is under city streets, the city must be in the position to set rules and regulations by which its street can be cut. This preemption … gives the FCC the right to waive any local fee and say, 'That's not the way it is going to be.'" 141 Cong. Rec. S8175 (daily ed. June 5, 1995). Similarly, Senator Gorton, speaking in favor of his amendment, stated, referring to Senators

---

**9.** Only one district court case discusses the relationship between state and federal jurisdiction in the context of the Telecommunications Act. As the court wrote in that case:

Although Congress intended local federal district courts to have jurisdiction over Section 253(c) disputes, there is a presumption that state courts have concurrent jurisdiction to adjudicate claims arising under federal statutes. The 'presumptive compe-

tence' of state courts to hear cases arising under a federal statute may only be overcome by language in the statute affirmatively divesting the state courts of jurisdiction. Nowhere in the Telecommunications Act of 1996 did Congress evince any intent to divest state courts of jurisdiction under Section 253(c).

*City of Chattanooga v. BellSouth Telecomm., Inc.,* 1 F.Supp.2d 809, 815 (E.D.Tenn.1998).

Feinstein and Kempthorne's concerns, that:

> Now, our two distinguished colleagues said that that preemption was much too broad, that its effect would be to say to a major telecommunications provider or utility all you have to do, if the city of San Francisco or the city of Boise attempts to tell you what hours you can dig in the city streets or how much noise you can make or *how you have to reimburse the city for the damage to its public rights-of-way,* that all the utility would have to do would be to appeal to the Federal Communications Commission in Washington, DC, and thereby remove what is primarily a local question and make a Federal question out of it which had to be decided in Washington, DC, by the Federal Communications Commission.

141 Cong. Rec. S8212 (daily ed. June 5, 1995) (italics added). Finally, Representative Porter J. Goss (Republican–Florida), commenting on the conference report, observed that, "As I understand it, localities will maintain their ability to control the public rights-of-way and to receive fair compensation for its use. Federal interference is unnecessary, as long as localities do not discriminate. I think that is fair." 142 Cong. Rec. H1150 (daily ed. Feb. 1, 1996). He also affirmed that "[Section 253(c) ] further recognizes that states and local governments may apply different management and compensation requirements to different telecommunications providers to the extent that they make different use of the public rights of way." *Id.* Cumulatively, these statements demonstrate that Section 253 was not intended to transform state and local statutes' treatment of all telecommunications issues into federal questions.

Verizon also argues that the City's failure to move below to remand the case to state court means that it intended to raise a federal claim and, as a result, cannot argue in this Court that federal question jurisdiction does not lie. The case upon which Verizon relied substantially during oral argument, *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960 (2d Cir.1981), is distinguishable from this one in several respects; in *Vitarroz,* the complaint did not mention either state or federal causes of action and, furthermore, the facts pleaded could give rise to very similar federal or state law claims. The panel in *Vitarroz* considered whether federal jurisdiction existed in the context of an appeal from a denial of injunctive relief in a trademark case. Plaintiff Vitarroz had brought suit in New York State Supreme Court, claiming trademark infringement and unfair competition; however, "[t]he complaint did not specify whether these claims were based on state or federal law." *Id.* at 962. Elaborating upon the ambiguity of Vitarroz' initial complaint, we stated that, "The complaint alleges facts to show trademark infringement, a claim that can be cast as a violation of either state law . . . or federal law . . . . The problem here is that the trademark infringement claim was not explicitly pleaded as one arising under federal law." *Id.* at 963–64. By contrast, in this case, the City of Rome not only brought its declaratory judgment action in state court but also, in its complaint, explicitly requested a statement of its rights under state and city law. Whereas in *Vitarroz,* the panel determined that the pleader's reliance on state law was not "manifest," and, hence, because the plaintiff had litigated in federal court, any ambiguities should be construed in favor of the statement of a federal claim, *Vitarroz,* 644 F.2d at 964–65, here the City's complaint explicitly invoked state and local law. In addition, the federal and state claims in *Vitarroz* were quite similar, unlike here, where the nature of the state law

and Telecommunications Act issues differ significantly.

Nor is our analysis substantially altered by the threat the City presented in its letter of September 28, 2001, when it stated that, "effective October 1, 2001, until negotiations to renew the franchise are commenced, the City will not permit Verizon to perform work under the streets located within the City of Rome." Letter from Rome to Verizon of Sept. 28, 2001. At oral argument, the City stipulated that it would never in the future threaten such actions in response to Verizon's failure to negotiate. Furthermore, the City's threat is not as significant as Verizon would like it to appear. Under the language and legislative history of Section 253, municipalities clearly retain their longstanding capacity to manage their rights of way and obtain reasonable compensation. It may be, therefore, that denial of access would be an appropriate remedy where a telecommunications company refuses to consider a city's proper request for fees or disregards a locality's attempt to manage its rights of way. In such a circumstance, it would make no sense to read the language of (Section 253—"a) *In general,* No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service" (italics added)—as preventing a state or locality from undertaking action consistent with the legislative purpose. Section 253 does not assert that any telecommunications company may gain uncon-

ditional access to all cities' streets, but instead that cities must not raise barriers to entry that are discriminatory or not competitively neutral.

Should its other arguments not prevail, Verizon urges us to constructively amend the complaint to acknowledge that federal issues were litigated below. According to the law of this Circuit, "[w]e have the *discretionary* power under certain circumstances to amend a complaint constructively to recognize unpleaded claims." *Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 569 (2d Cir. 1995) (italics added). Constructive amendment is a judicially created doctrine that courts have extrapolated from the language of Federal Rule of Civil Procedure 15(b).[10] We consider Verizon's request against the backdrop of extremely sparing past use of constructive amendment in this Circuit—amounting to only one prior instance within the last forty years. *See Wahlstrom v. Kawasaki Heavy Indus., Ltd.,* 4 F.3d 1084 (2d Cir.1993).

Elaborating upon when we allow constructive amendment, we noted in *Greenblatt* that, "[a]s a general rule, we will permit amendments only when the effect will be to acknowledge that certain issues upon which the lower court's decision has been based or issues consistent with the trial court's judgment have been litigated." *Greenblatt,* 68 F.3d at 569 (internal citations and quotation marks omitted). Even when federal issues have been litigated, the parties cannot invoke constructive amendment to escape the ordi-

---

10. *See Walton v. Jennings Cmty. Hosp., Inc.,* 875 F.2d 1317, 1320 n. 3 (7th Cir.1989) (extrapolating constructive amendment from "the spirit of Rule 15(b)"); Fed.R.Civ.P. 15(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.").

nary boundaries of federal jurisdiction. In other words, the fictitious complaint emerging out of the constructive amendment must satisfy the principles behind the well-pleaded complaint rule. Because it is not self-evident in this case that the City could have asserted a federal cause of action under Section 253(c) in any actual complaint, and because, even on appeal, Rome has not clearly articulated a basis for recovery under federal law, we do not deem constructive amendment appropriate. *See Greenblatt,* 68 F.3d at 569 (declining to constructively amend the complaint "to vindicate a theory of jurisdiction the district court never addressed").

It is well established that, in a declaratory judgment action, federal jurisdiction does not lie "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action." *Franchise Tax Bd.,* 463 U.S. at 16, 103 S.Ct. 2841 (1983). As discussed above, the role that Section 253 has played in this action is primarily that of a defense against the City's attempt to exercise rights it claims under state and local law, and its efforts to impose a new franchise agreement upon Verizon. Although Rome cloaked several claims in the language of federal law in its brief to this Court,[11] the City still does not clearly assert a right under Section 253; it argues merely that Section 253 does not

preempt the state and local laws that provide the source of Rome's rights. Nor has this Court yet determined whether 253(c) could ever, in fact, supply a municipality with an affirmative federal cause of action. Were the City's complaint constructively amended to reflect the federal issues litigated below, it would ask not for a declaratory judgment of its *rights* under Section 253, but rather of the *survival* of its rights under state and local law notwithstanding any defense Verizon might have under Section 253. This situation presents a stark contrast to that in *Wahlstrom v. Kawasaki Heavy Industries, Ltd.,* 4 F.3d 1084 (2d Cir.1993), our only recent decision applying constructive amendment, where the plaintiffs asserted a right to relief under federal law. In *Wahlstrom,* the plaintiffs brought claims under state tort law but then, in response to the defendant's assertion of federal maritime law as an affirmative defense, argued that they were also entitled to relief under federal maritime law, which provided an alternative cause of action. *Id.* at 1087 (stating that "the parties' briefs and oral argument on appeal focused squarely on the issue of what relief, if any, is available to the Wahlstroms under federal maritime law"). Because the City has not argued that Section 253 gives rise to a federal claim, we decline to so amend the complaint.[12]

11. For example, the City claimed that Section 253(c)'s requirement of competitive neutrality obligates the City to impose the same fees on Verizon as it has upon other telecommunications providers. Appellant's Brief at 13–15.

12. The dissent argues that, even if Rome does not possess a federal claim under Section 253(c), "the City could surely have brought a declaratory judgment action to determine whether its conduct would violate section 253 by imposing the Standard Franchise Agreement," Scheindlin Dissent 15, and that, in such a case, subject matter jurisdiction would lie. In the context of this litigation, however,

it is not clear that Verizon's invocation of Section 253 ever transformed itself from a defense into a coercive cause of action. It is, furthermore, difficult to imagine a perspective from which Verizon could be considered the party requesting affirmative relief. Verizon currently continues to use the City's rights of way, and the City declared at oral argument that it will not prevent Verizon from doing so. Basing federal jurisdiction upon the claim under Section 253 that Verizon *might* have raised against a franchise agreement that the City proposed would not accord with Verizon's position that, having once obtained the ability to lay lines and use the City's rights of

CONCLUSION

The traditional bases for federal jurisdiction, such as the assertion of a federal claim in a well-pleaded complaint, complete preemption of state law, or the intent to raise a federal claim, are lacking in this case. We also determine that the circumstances of this case do not warrant constructively amending the complaint to include a federal cause of action. Because subject matter jurisdiction is absent, we vacate the judgment and order of the district court, which we instruct to remand the case to the New York State Supreme Court, Oneida County.

SCHEINDLIN, District Judge, dissenting.

I agree that under the "well pleaded complaint" rule, the City of Rome failed to raise a federal question that provides a basis for subject matter jurisdiction. I

dissent, however, because I would deem the City's complaint to be constructively amended to raise a claim under the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996).[1] As the majority correctly notes, "[w]e have the discretionary power under certain circumstances to amend a complaint constructively to recognize unpleaded claims ... when the effect will be to acknowledge that certain issues upon which the lower court's decision has been based or issues consistent with the trial court's judgment have been litigated." *Greenblatt v. Delta Plumbing & Heating Corp.*, 68 F.3d 561, 569 (2d Cir.1995) (quoting 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1494, at 56 (2d ed.1990)). Because the lower court undoubtedly based its decision on—and the parties have consistently litigated—questions of federal law,

---

way, it is not obliged to seek any additional franchise; it would, moreover, put us at even greater risk than usual in the declaratory judgment context of adjudicating a controversy before it is ripe. *See Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (determining that a declaratory judgment action based upon a claim that "rest[ed] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," was not ripe) (internal quotation marks omitted); *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.,* 925 F.2d 556, 562 (2d Cir.1991) ("The question in each case in which a declaratory judgment is sought is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.... Whether a real and immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis.").

1. Section 253 of the Act, entitled "Removal of barriers to entry," provides in pertinent part:

 (a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority
Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
47 U.S.C. § 253 (1996).

constructive amendment is the proper course.

## I.

The majority implies that even if we were so inclined, we have no *power* to constructively amend the City's complaint because "it is not self-evident in this case that the City could have asserted a federal cause of action under Section 253(c) in *any* actual complaint." (emphasis supplied.) I address this contention first.

Because the City's complaint requested declaratory relief, the proper question is not whether the City "has articulated a basis for recovery under federal law" on some claim that the City *itself* may possess, but whether the City has articulated a basis under which *Verizon* might recover under federal law, and thus on which the City might seek declaratory relief.[2] The answer to *that* question is "yes".

Four judges of the Court of Appeals for the Fourth Circuit, dissenting in *Interstate Petroleum Corp. v. Morgan,* recently explained why:

> Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (West 1994). Although the Declaratory Judgment Act "does not broaden federal jurisdiction, *see, e.g.,*

*Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), it does allow parties to precipitate suits that otherwise might need to wait for the declaratory relief defendant to bring a coercive action." *Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464, 1467 (11th Cir.1987) (parallel citations omitted); *see Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 19 & n. 19, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Aetna Cas. & Sur. Co. v. Quarles,* 92 F.2d 321, 325 (4th Cir.1937). That the federal right actually litigated when declaratory relief is sought may belong to the declaratory judgment *defendant* rather than to the declaratory judgment *plaintiff* does not change the fact that the action arises under federal law. *See Columbia Gas. Transmission Corp. v, Drain,* 237 F.3d 366, 370 (4th Cir.2001); *Lowe v. Ingalls Shipbuilding,* 723 F.2d 1173, 1179 (5th Cir.1984); *Gulf States Paper,* 811 F.2d at 1467 (explaining that the declaratory judgment remedy "allows a party to bootstrap its way into federal court by bringing a federal suit that corresponds to one the opposing party might have brought" (internal quotation marks omitted)). Accordingly, "[a] person may seek declaratory relief in federal court if the one against whom

---

**2.** This may not be the proper question in *all* cases involving declaratory relief. However, where a plaintiff requests a declaration that will, in effect, turn aside an impending coercive suit by the defendant, jurisdiction is determined "by the character of the threatened action." *Hunter Douglas Inc. v. Sheet Metal Workers International Association, Local 159,* 714 F.2d 342, 345 (4th Cir.1983) (citing *Public Service Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 97 L.Ed. 291 (1952)). The course of litigation in this case made clear that the City sought to avert Verizon's assertion of rights under the Telecommunications Act as much as it sought a decla-

ration of its own rights. Of particular note in this regard are two letters from Verizon to the City, attached as exhibits to the City's complaint, which contain thinly-veiled threats from Verizon that it would sue the City under the Telecommunications Act. *See, e.g.,* 6/5/01 Letter from Verizon to City of Rome, Ex. C to the Complaint (citing the Telecommunications Act and cases decided thereunder before concluding, "We trust that the City will continue to allow Verizon to install and maintain its facilities within the public rights-of-way without interference with our state franchise rights and that no other legal action to enforce our rights will be necessary.").

he brings his action could have asserted his own rights there." *Standard Ins. Co. v. Saklad*, 127 F.3d 1179, 1181 (9th Cir.1997); *Columbia Gas Transmission*, 237 F.3d at 370 (explaining that under certain circumstances "the proper jurisdictional question is whether the complaint alleges a claim arising under federal law that the declaratory judgment defendant could affirmatively bring against the declaratory judgment plaintiff"); *Hunter Douglas Inc. v. Sheet Metal Workers International Association, Local 159*, 714 F.2d 342, 345 (4th Cir.1983) (explaining, in context of removal from state court, that whether a district court has subject matter jurisdiction over a declaratory judgment action is determined "by reference to the character of the threatened action.").

249 F.3d 215, 226–27 (4th Cir.2001) (en banc) (Wilkins, Williams, Motz, and Traxler, JJ., dissenting). *See also Franchise Tax Bd.*, 463 U.S. at 19 n. 19, 103 S.Ct. 2841 (noting with approval that "[f]ederal courts have routinely taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question."); *Columbia Gas Transmission*, 237 F.3d at 370 ("[I]n a declaratory judgment action, the federal right litigated may belong to the declaratory judgment defendant rather than the declaratory judgment plaintiff.") [3]

There is no serious question that Verizon could have asserted a claim against the City under section 253 of the Telecommunications Act. *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 73–75 (2d Cir.2002) (holding that court had jurisdiction over telecommunications provider's claim under section 253); *see also New Jersey Payphone Ass'n v. Town of West New York*, 299 F.3d 235 (3d Cir.2002); *BellSouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169 (11th Cir.2001); *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 624 (6th Cir.2000) (holding that Section 253 "authorizes a private right of action in federal court for telecommunications providers").[4] Because the district court would have had jurisdiction if Verizon had brought such a suit, it also had jurisdiction when the City sought a declaration that it did not violate Verizon's rights under the Telecommunications Act.[5]

---

**3.** The Supreme Court has explained that "[t]aking jurisdiction over this type of suit is consistent with the dictum in [*Public Service Comm'n*, 344 U.S. at 248, 73 S.Ct. 236], in which we stated only that a declaratory judgment plaintiff could not get original federal jurisdiction if the anticipated lawsuit by the declaratory judgment defendant would not 'arise under' federal law. It is also consistent with the nature of the declaratory remedy itself, which was designed to permit adjudication of either party's claims of right. *See* E. Borchard, Declaratory Judgments 15–18, 23–25 (1934)." *Franchise Tax Bd.*, 463 U.S. at 19 n. 19, 103 S.Ct. 2841.

**4.** Although we explicitly declined to decide whether section 253 confers a private right of action on telecommunications providers in *TCG New York*, the passages from the legislative history cited by the majority strongly suggest that such a right exists. The remarks of Senator Slade Gorton are particularly telling:

> There is no preemption ... for subsection (c) which is entitled, 'Local Government Authority,' and which is the subsection which preserves to local governments control over their public rights of way. It accepts the proposition from those two Senators that these local powers should be retained locally, *that any challenge to them take place in the Federal district court in that locality* and that the Federal Communications Commission not be able to preempt such actions.

141 Cong. Rec. S8213 (daily ed. June 13, 1995) (emphasis supplied).

**5.** Of course, I recognize that the City did not explicitly seek such a declaration in its complaint. Rather, as explained more fully be-

## II.

Assuming, then, that we have the authority to constructively amend the City's complaint, it follows under the facts of this case that we should exercise that authority. Here, the district court based its decision *solely* on the application of the Telecommunications Act. But even before that, the parties to the suit—particularly the City—had so injected federal issues into this litigation that in its submissions to this court, the City conceded that it had asserted "Federal claims."

The City's complaint originally asked for a declaration determining "the legal rights and liabilities of the parties hereto with respect to the Franchise granted to Defendant, pursuant to § 27 of the New York State Transportation Corporation Law and § 33 of the City of Rome Charter...." The majority presumes that this means that the City was explicitly asking for a declaration of its rights under state law.

As an initial matter, it is not at all clear that the City's complaint raises only state law claims. The complaint is susceptible to two equally plausible readings; it can be read as asking either (1) for a declaration of the parties' rights under state law, or (2) for a declaration of the parties' rights regarding a franchise that was *granted* *pursuant to* state law. In support of the second reading is the City's continual references to Section 27 of the Transportation Corporation Law and Section 33 of the City Charter as the sources of its authority to grant franchises. *See, e.g.*, Complaint ¶ 4 ("Pursuant to § 27 of the New York State Transportation Corporation Law and § 33 of the Rome City Charter, on or about December 19, 1949, Plaintiff granted the original grantee the license or franchise to use the public streets and other public rights-of-way ... in connection with the transaction of the Original Grantee's telecommunications business."); *see also* *id.* ¶¶ 5, 8 (alleging that TCL § 27 and § 33 of the City Charter govern the duration of franchises and transferability of franchises to a grantee's successor-in-interest). Also in support of this reading is a chain of correspondence between the City and Verizon attached to the complaint, discussing federal, state, and local law. Although the majority is certainly correct to conclude that this correspondence does not raise a federal question under the well-pleaded complaint rule, it provides context to the City's allegations and suggests that the ambiguous phrase "legal rights and liabilities" refers to rights and liabilities under federal—as well as state and local—law.[6]

low, the City's actions throughout the entire litigation history of this case make plain its intention to have its rights under the Telecommunications Act adjudicated.

**6.** In further support of this second reading is that the City's request for a declaration determining "the legal rights and liabilities of the parties hereto with respect to the Franchise granted to Defendant, pursuant to § 27 of the New York State Transportation Corporation Law and § 33 of the City of Rome Charter," fails to cite section 23 of the New York General City Law. The City has persistently cited section 23 of the General City Law as the statute responsible for the expiration of Verizon's franchise and Verizon's need to negotiate a new one. *See, e.g.*, Affidavit in Opposition to Defendant's Motion to Dismiss ¶ 6 ("in 1913, the State of New York enacted Section 23 of the General City Law, and said law, among other things, limited the duration of franchises by cities within the State of New York to fifty (50) years."); *id.* ¶ 13 ("By virtue of § 33 of the Rome Charter Laws and § 23(b)(2) of the NYS General City Law both limiting the duration of franchises granted by cities to fifty (50) years, Defendant's 1949 Franchise expired on December 19, 1999."). The omission of section 23 of the General City Law from the City's request for relief leads to the conclusion that the citations that *are* there—to section 27 of the Transportation Corporation Law and section 33 of the City Charter—only describe the source of the City's historical authority to grant the franchise.

Under this reading, the City's complaint only asks for an adjudication of its rights and liabilities *generally*, not with specific reference to state law, as the majority assumes. Thus, this case is similar to *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960 (2d Cir.1981), where we found federal question jurisdiction when plaintiff did not oppose removal of a case that, while originally filed in state court, could have given rise to either state or federal claims. *See id.* at 964 ("by not contesting jurisdiction at an early stage, we think the plaintiff permitted the District Court to exercise jurisdiction, since the Court was entitled to conclude that the plaintiff was willing to see its ... claim treated as one based on federal law."). Here, as in *Vitarroz*, the City not only acquiesced to Verizon's removal of its case to federal court, but actively litigated federal issues once in district court.

In any event, by the time the lower court was ready to address Verizon's motion to dismiss, the City was assuredly asking for a declaration under both state and federal law. In the course of litigation the City *voluntarily* submitted to the district court its Standard Franchise Agreement, which provided the basis for its franchise negotiations with Verizon's competitors. The Standard Franchise Agreement was not submitted merely as an example of negotiations between the City and other telecommunications providers. Rather, the City stipulated—in the course of motion practice—that "said form would substantially be the same form utilized between the City and [Verizon]," and that it "set forth the *fixed* parameters and criteria upon which *all* telecommunication[s] franchises are granted," 10/6/03 Verizon Letter Brief 3 (quoting City of Rome's Opposition to Verizon's Motion to Dismiss at 10) (emphasis supplied, alterations in

original). Indeed, the crux of the City's argument under the Telecommunications Act is that it is *required* to impose the Standard Franchise Agreement on Verizon, otherwise the City would not be treating telecommunications providers "on a competitively neutral and nondiscriminatory basis," 47 U.S.C. § 253(c). *See* Appellant's Brief at 15 ("the lower court's failure to require Defendant to negotiate and enter into a franchise agreement would ... put the City in danger of violating the [Act], as other service providers that have entered a franchise agreement with the City could allege illegal disparity of treatment. More specifically, conditions that have been imposed on already franchised providers and new service providers, have not been applied to Verizon, and it is that difference in treatment that is prohibited...."); *id.* at 7–8 ("the documents utilized between the City/Adelphia and City/Fibertech are similar in form and content as the one that *would be utilized* between the City of Rome and Verizon") (emphasis supplied).

The majority claims that "[t]here is some dispute about how susceptible to alteration the provisions included with the City's 'standard franchise agreement' actually are." But the City has admitted in an affidavit before the district court and in its brief before this Court that the Standard Franchise Agreement's terms are essentially inflexible. As evidence of the supposed dispute, the majority points to a footnote—appended to the City's admission that the Standard Franchise Agreement is "similar in form and content as the one that would be utilized between the City of Rome and Verizon"—that purports to "address a possible misconception" by explaining that Verizon was still free to "negotiate the language" of its own fran-

chise agreement. Taken in context, this footnote only explains that while the parties may have been able to "negotiate the language" of any agreement between them, the Standard Franchise Agreement nevertheless supplies the rigid "parameters and provisions" of that agreement. Any suggestion that Verizon could have negotiated the essential terms of the Standard Franchise Agreement is belied by the City's own argument that it was required to impose the same conditions on all telecommunications providers.

The City's actions during this litigation may provide some insight into the declaration it actually seeks. Reviewing only the four corners of the complaint, it appears that the City *initially* sought a declaratory judgment as to whether Verizon is obliged to negotiate with the City to renew its franchise. But what the City *eventually* sought was a declaratory judgment as to Verizon's obligation to agree to the Standard Franchise Agreement (or a substantially similar agreement). *See, e.g.,* Affidavit in Opposition to Defendant's Motion to Dismiss ¶ 20 ("On or about June 6, 2002, upon motion of Defendant, the matter was removed to Federal Court for the Northern District of New York to determine the threshold issue of whether or not granting the City's requested relief would violation [sic] 47 U.S.C.S. § 253."); Appellant's Brief at 23–28 (devoting six pages of the City's brief to the argument that "Provisions of City's Franchise Agreement Are Consistent With Federal Law And Are Validly Related to Management of its Rights-of-Way."); *id.* at 3 ("Under 28 U.S.C.S. § 1331, the Northern District Court of New York had original jurisdiction over this matter by virtue of the fact [that] the controversy involved the laws of the United States—more specifically interpreting the Telecommunications Act of 1996.") (emphasis supplied, citations omitted).

Moreover, the district court plainly viewed the City's declaratory judgment action as a request for construction of its rights under Section 253(c). The court elected not to decide the state and local claims. Instead, the district court focused almost entirely on the validity of the Standard Franchise Agreement under the Telecommunications Act, concluding that, "While the City is permitted to enact and impose lawful ordinances and legal requirements on [Verizon] that conform with section 253(c) ... and other applicable laws and legal rights, [Verizon] is under no obligation to negotiate with the City under the terms of the proposed Agreement." *City of Rome, New York v. Verizon Communications, Inc.,* 240 F.Supp.2d 176, 181 (N.D.N.Y.2003).

This case is very similar to our recent decision in *Wahlstrom v. Kawasaki Heavy Indus. Ltd.,* 4 F.3d 1084 (2d Cir.1993), where we constructively amended a complaint. *Wahlstrom* involved a suit for wrongful death under Connecticut state law. Defendant, in turn, asserted federal maritime law as an affirmative defense, and plaintiffs responded by asserting a right under maritime law as well. The court constructively amended the complaint because "the parties' briefs and oral argument on appeal focused squarely on the issue of what relief, if any, is available to the Wahlstroms under federal maritime law." *Id.* at 1087. Similarly, the City's complaint seeks a declaration of its rights and liabilities. Verizon asserted the Telecommunications Act as an affirmative defense, and the City responded by asserting a right (to manage its rights-of-way) under section 253(c) of the Act. And, as in *Wahlstrom,* the parties' briefs—both below and on appeal—and oral argument were addressed primarily to the parties' rights and liabilities under federal law.

The majority attempts to distinguish *Wahlstrom* by questioning whether the City could have brought a claim under Section 253. "Were the City's complaint constructively amended to reflect the federal issues litigated below," the majority argues, "it would ask not for a declaratory judgment of its *rights* under Section 253, but rather of the *survival* of its rights under state and local law notwithstanding any defense Verizon might have under Section 253." This linguistic legerdemain is not convincing. Section 253(c) specifically preserves "the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers ...." 47 U.S.C. § 253(c). Whether Section 253(c) thus contains a *grant* of authority or a *preservation* of existing authority is a distinction without a difference. Under the terms of the statute, Section 253(c) reserves to state and localities the power to manage their public rights-of-way; it follows that they can bring a declaratory judgment action to construe their rights under that section. And indeed, that is precisely what the City has effectively done by asserting that Section 253(c) "provides the City with the ability to obtain reasonable compensation for [Verizon's] utilization of the City's rights-of-way." *See also* Appellant's Brief at 2 (arguing that "[b]ecause *Federal,* State and local law *collectively* give the City the right to manage its public rights-of-way and grant franchises, the City acted appropriately by attempting to compel Defendant to renew its franchise.") (emphasis supplied). In all events, the City could surely have brought a declaratory judgment action to determine whether its conduct would violate section 253 by imposing the Standard Franchise Agreement, *see* *supra* Part I, thereby preempting a potential suit by Verizon.

## III

That the parties' conduct can crystallize the issues in a litigation is a basic tenet of notice pleading, which "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). It makes little sense now to return to the question presented in the City's complaint, disregarding the substantial expenditure of efforts by the court and the parties in the interim. *See Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.,* 312 F.3d 82, 89 (2d Cir.2002) (explaining that federal courts have an "imperative to salvage jurisdiction where possible," even when it did not originally exist); *see also Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (noting that requiring dismissal after judgment "would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention."). Having framed the question in terms of the Standard Franchise Agreement—and thus, under federal law—the City cannot now complain that it does not like the answer. *See Vitarroz,* 644 F.2d at 965 (holding that the court will not "permit the pleader of an ambiguous claim to assert his preference for a state forum after a set of facts that can be pleaded as a federal claim has been removed to federal court and allowed to remain there for some period of time."); *cf. Barbara v. N.Y. Stock Exchange, Inc.,* 99 F.3d 49, 49 (2d Cir. 1996) ("[O]nce [plaintiff] decided to take advantage of his involuntary presence in federal court to add a federal claim to his complaint, he was bound to remain there.") (citation omitted). To hold otherwise would be manifestly unfair to Verizon, and to the district court that carefully adjudi-

cated the issues presented to it by the parties. I therefore respectfully dissent.