*Connecticut ex rel. Tong v. Exxon Mobil Corp.*

# United States Court of Appeals
# For the Second Circuit

August Term 2022

Argued:  September 23, 2022
Decided: September 27, 2023

No. 21-1446-cv

STATE OF CONNECTICUT, by its
Attorney General, WILLIAM M. TONG,

*Plaintiff-Appellee*,

*v.*

EXXON MOBIL CORPORATION,

*Defendant-Appellant*.

Appeal from the United States District Court
for the District of Connecticut
No. 20-cv-1555, Janet C. Hall, *Judge*.

Before:      SULLIVAN, NARDINI, and PÉREZ, *Circuit Judges*.

In 2020, the State of Connecticut sued Exxon Mobil Corporation ("Exxon Mobil") in Connecticut state court, alleging that Exxon Mobil had engaged in a decades-long campaign of deception to knowingly mislead and deceive Connecticut consumers about the negative climatological effects of the fossil fuels that Exxon Mobil was marketing to those consumers.  Based on these allegations, Connecticut asserted eight claims against Exxon Mobil, all under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a).  Exxon Mobil removed the case to federal district court, invoking subject-matter

jurisdiction under the federal-question statute, 28 U.S.C. § 1331, the federal-officer removal statute, *id.* § 1442(a)(1), and the Outer Continental Shelf Lands Act (the "OCSLA"), 43 U.S.C. § 1349(b)(1)(A), as well as on other bases no longer pressed in this appeal. The district court (Hall, *J.*) rejected each of Exxon Mobil's theories of federal subject-matter jurisdiction, and thus remanded the case to state court.

On appeal, we are tasked with deciding (1) whether the well-pleaded complaint rule is subject to any exceptions other than the three we enumerated in *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014); (2) whether Connecticut's CUTPA claims raise the federal common law of transboundary pollution as a necessary element for establishing Exxon Mobil's liability; (3) whether Exxon Mobil was "acting under" an "officer . . . of the United States" and "under color of such office," 28 U.S.C. § 1442(a)(1), for purposes of the allegedly deceptive acts forming the basis of Connecticut's CUTPA claims; and (4) whether such acts "aris[e] out of, or in connection with," Exxon Mobil's "operation[s]" on the outer continental shelf (the "OCS"), where Exxon Mobil extracts oil and gas on land leased from the federal government, 43 U.S.C. § 1349(b)(1)(A). We answer each of these questions in the negative. As a result, we **AFFIRM** the district court's order remanding this case to the Connecticut Superior Court for the District of Hartford.

AFFIRMED.

BENJAMIN W. CHENEY, Assistant Attorney General (Matthew I. Levine, Deputy Associate Attorney General; Daniel M. Salton, Jonathan E. Harding, Assistant Attorneys General, *on the brief*), *for* William M. Tong, Attorney General of Connecticut, Hartford, CT, *for Plaintiff-Appellee* State of Connecticut.

KANNON K. SHANMUGAM, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC (Justin Anderson, Kyle

Smith, William T. Marks, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Theodore V. Wells, Jr., Daniel J. Toal, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Kevin M. Smith, Tadhg Dooley, Wiggin & Dana LLP, New Haven, CT; Robert M. Langer, Wiggin & Dana, LLP, Hartford, CT; Patrick J. Conlon, Exxon Mobil Corporation, Spring, TX, *on the brief*), *for Defendant-Appellant* Exxon Mobil Corporation.

RICHARD J. SULLIVAN, *Circuit Judge*:

In 2020, the State of Connecticut sued Exxon Mobil Corporation ("Exxon Mobil") in Connecticut state court, alleging that Exxon Mobil had engaged in a decades-long "campaign of deception" to knowingly mislead and deceive Connecticut consumers about the negative climatological effects of the fossil fuels that Exxon Mobil was marketing to those consumers. J. App'x at 8. Based on these allegations, Connecticut asserted eight claims against Exxon Mobil, all under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a). Exxon Mobil removed the case to federal district court, invoking subject-matter jurisdiction under the federal-question statute, 28 U.S.C. § 1331, the federal-officer removal statute, *id.* § 1442(a)(1), and the Outer Continental Shelf Lands Act (the "OCSLA"), 43 U.S.C. § 1349(b)(1)(A), as well as on other bases no longer

3

pressed in this appeal.  The district court (Hall, *J.*) rejected each of Exxon Mobil's theories of federal subject-matter jurisdiction, and thus remanded the case to state court.

On appeal, we are tasked with deciding (1) whether the "well-pleaded complaint rule," *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), is subject to any exceptions other than the three we enumerated in *Fracasse v. People's United Bank*, 747 F.3d 141, 144 (2d Cir. 2014); (2) whether Connecticut's CUTPA claims raise the "federal common law of transboundary pollution," Exxon Mobil Br. at 30–31; *cf. City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), as a necessary element for establishing Exxon Mobil's liability; (3) whether Exxon Mobil was "acting under" an "officer . . . of the United States" and "under color of such office," 28 U.S.C. § 1442(a)(1), for purposes of the allegedly deceptive acts forming the basis of Connecticut's CUTPA claims; and (4) whether such acts "aris[e] out of, or in connection with," Exxon Mobil's "operation[s]" on the outer continental shelf (the "OCS"), where Exxon Mobil extracts oil and gas on land leased from the federal government, 43 U.S.C. § 1349(b)(1)(A).  For the reasons explained below, we answer each of these questions in the negative.  As a result, we **AFFIRM** the

4

district court's order remanding this case to the Connecticut Superior Court for the District of Hartford.

## I. Background

### A. Facts

Exxon Mobil is a multinational energy and chemicals company and was ranked the eleventh-largest public company in the world in 2019. Exxon Mobil's "principal business is energy, involving exploration for, and production of, crude oil and natural gas, manufactur[ing] of petroleum products[,] and transportation and sale of crude oil, natural gas and petroleum products." J. App'x at 17 (internal quotation marks omitted). The State of Connecticut alleges that Exxon Mobil has engaged "[f]or several decades" in a "campaign of deception" that "has misled and deceived Connecticut consumers about the negative effects of its business practices on the climate." *Id.* at 8. More specifically, Connecticut alleges as follows:

Since the 1950s, Exxon Mobil's corporate leadership has been aware of research indicating that the combustion of fossil fuels – such as those produced and marketed by Exxon Mobil – causes dangerous changes to the Earth's climate. Indeed, much of that research has been *internal* research, commissioned by Exxon Mobil and conducted by its own in-house scientists. Throughout the 1970s and

5

1980s, as the issues of "climate change and its potentially catastrophic consequences" grew increasingly prevalent in American public discourse, *id.*, Exxon Mobil's leadership grew increasingly concerned that the company would face catastrophic economic consequences if consumer markets for oil and gas were to be softened by widespread public acceptance of what Exxon Mobil's own internal research had long suggested: that fossil fuels play a significant role in causing climate change.

In an effort to protect its profitability and revenues, Exxon Mobil began publishing and commissioning "advertisements, interviews, . . . research papers," and other public "statements casting doubt on th[e] connection" between fossil fuels and global warming in various media outlets consumed by "tens of thousands of Connecticut residents, nearly every week." *Id.* at 26–41, 218. Even after "finally admitting publicly that combustion of fossil fuels contributes to climate change," Exxon Mobil continued to publish advertising "falsely portraying [itself] as a corporation committed to seriously combatting climate change." *Id.* at 9.

The effect of this "campaign of deception" has been that "many consumers still do not believe the scientific facts" of climate change and its causal connection

6

to fossil fuels. J. App'x at 10. Closer to home, it has resulted in "Connecticut consumers" purchasing "more oil and gasoline than [they] would have purchased had the reality of climate change been disclosed." *Id.* at 9, 43. As a corollary, it has also "resulted in the stifling of an open marketplace for renewable energy, thereby leaving consumers unable to reasonably avoid the detrimental consequences of fossil[-]fuel combustion." *Id.* at 46.

## B. Procedural History

On the basis of this alleged "campaign of deception," the State of Connecticut, by and through its Attorney General, commenced this suit against Exxon Mobil on September 14, 2020 in the Connecticut Superior Court for the District of Hartford. Connecticut's complaint asserted eight claims – all under CUTPA, which provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). The Connecticut Supreme Court has read two distinct causes of action into CUTPA – one for "decepti[on]," *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597 (1990) (explaining that a deception claim requires a "material" "representation, omission, or practice" that is "misleading" when interpreted "reasonably under the circumstances"), and the other for "unfairness," *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013) (noting that the sole element of an unfairness claim

7

is "a [trade] practice [that] is unfair"). Here, Connecticut brought four claims for deception and four for unfairness. Based on these claims, Connecticut sought numerous forms of relief, including, among others: (1) an injunction enjoining Exxon Mobil from continuing to engage in deceptive practices under CUTPA; (2) civil penalties of $5,000 per willful violation of CUTPA; (3) disgorgement of revenues attributable to unfair practices under CUTPA; and (4) "[e]quitable relief" for "deceptive acts and practices that will require future climate[-]change mitigation," including in the form of "restitution" for "all expenditures attributable to Exxon[ ]Mobil that [Connecticut] has made and will have to make to combat the effects of climate change." J. App'x at 51 ¶¶ 3, 5 (citing Conn. Gen. Stat. § 42-110m).

Exxon Mobil timely removed Connecticut's action to federal district court. In its notice of removal, Exxon Mobil invoked federal subject-matter jurisdiction under the federal-question statute, the federal-officer removal statute, and the OCSLA, as well as other statutory provisions no longer relevant on appeal. Following removal, Connecticut moved to remand the case to state court. After a full round of briefing and oral argument, the district court issued a lengthy opinion rejecting all of Exxon Mobil's asserted grounds for federal jurisdiction and

granting Connecticut's motion to remand the case to the Connecticut Superior Court for the District of Hartford.

Exxon Mobil timely appealed.

## II. Appellate Jurisdiction

As a general matter, "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise." 28 U.S.C. § 1447(d). However, such an order *is* "reviewable by appeal" where, as here, the case "was removed pursuant to [28 U.S.C. §] 1442," i.e., the federal-officer removal statute. *Id.*

Until recently, there was "persistent circuit conflict" as to the scope of appellate review authorized by this statutory exception in cases, like this one, where "the removing defendant [had] premised removal [only] *in part* on the federal-officer removal statute." Petition for a Writ of Certiorari at 11, *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532 (2021) (No. 19-1189), 2020 WL 1557798, at *11 (emphasis added). Eight circuits – including our own – had taken the view that appellate review under section 1447(d)'s exception for federal-officer removal cases "is . . . confined to a defendant's removal arguments under the federal[-]officer . . . removal statute[]." *BP P.L.C.*, 141 S. Ct. at 1537; *see State Farm*

*Mut. Auto. Ins. Co. v. Baasch*, 644 F.2d 94, 96–97 (2d Cir. 1981) (so holding); *Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 55–56, 58–59 (1st Cir. 2020) (holding same; collecting earlier Second, Third, Fourth, Eighth, Ninth, Tenth, and Eleventh Circuit cases holding likewise), *cert. granted, judgment vacated*, 141 S. Ct. 2666 (2021). Three other circuits, meanwhile, had taken the broader view that "[i]nstead, a court of appeals may review the merits of *all* theories for removal that a district court has rejected," so long as one of those theories was federal-officer jurisdiction. *BP P.L.C.*, 141 S. Ct. at 1537; *cf. Mayor & City Council of Baltimore v. BP P.L.C.*, 952 F.3d 452, 460 & n.4 (4th Cir. 2021) (rejecting this view but collecting Fifth, Sixth, and Seventh Circuit cases that had adopted it), *vacated and remanded*, 141 S. Ct. 1532.

In 2021, however, the Supreme Court resolved that circuit split and held that "[o]nce" a "defendant's notice of removal [has] assert[ed] [that] the case is removable in accordance with" the federal-officer removal statute and "the district court [has] ordered the case remanded to state court, the *whole* of its order be[comes] reviewable on appeal." *BP P.L.C.*, 141 S. Ct. at 1538 (emphasis added; internal quotation marks omitted). Accordingly, our holding in *Baasch*, 644 F.2d at 96–97, has been abrogated, and we have appellate jurisdiction under

10

section 1447(d) to "consider *all* of [Exxon Mobil's asserted] grounds for removal," *BP P.L.C.*, 141 S. Ct. at 1543 (emphasis added).

### III.    Standard of Review

"We review an appeal from an order of remand de novo." *Agyin v. Razmzan*, 986 F.3d 168, 173–74 (2d Cir. 2021). Whether on appeal from a grant or a denial of a motion to remand, the "defendant always has the burden of establishing that removal is proper." *United Food & Com. Workers Union, Loc. 919 v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (citation and alteration omitted). We "construe the removal statute narrowly, resolving any doubts against removability," *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) (internal quotation marks omitted), out of "regard for the rightful independence of state governments," *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002) (internal quotation marks omitted).

### IV.    Discussion

"An[] action that was originally filed in state court may be removed by a defendant to federal court only if the case originally could have been filed in federal court." *Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998) (citing 28 U.S.C.

11

§ 1441(a)). We must therefore decide whether any of the eight claims in Connecticut's complaint – all of which were brought under a single state statute, namely, CUTPA – triggers either federal-question jurisdiction, federal-officer jurisdiction, or special jurisdiction under the OCSLA. If so, then removal was proper, and we must reverse the district court's remand order. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005) ("A single claim over which federal[] . . . jurisdiction exists is sufficient to allow removal." (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 562–63 (2005); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–66 (1997))). If not, then the district properly remanded this case to state court, and we must affirm.

## A. Federal-Question Jurisdiction

### 1. The Well-Pleaded Complaint Rule

The federal-question statute provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331. Our analysis of whether a case "aris[es] under the . . . laws . . . of the United States," *id.*, is "governed by the 'well-pleaded complaint rule,'" *Caterpillar*, 482 U.S. at 392. Under that rule, federal-question jurisdiction generally "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint" and cannot be triggered "on the basis of a

12

federal defense, . . . even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393.

The principal effect of the well-pleaded complaint rule is to "make[] the plaintiff the master of the claim," meaning that – subject to certain exceptions – plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law." *Id.* at 392. In other words, the "general rule" is that federal courts lack federal-question jurisdiction "if the complaint does not affirmatively allege a federal claim." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003); *see New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) ("[F]ederal-question jurisdiction is invoked by and large [where] plaintiffs plead[] a cause of action created by federal law." (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)) (alteration omitted)).

Here, of course, Connecticut's complaint did not "affirmatively" allege any "cause of action created by federal law." *Wells Fargo*, 824 F.3d at 315 (quoting *Grable*, 545 U.S. at 312). Instead, all eight of Connecticut's CUTPA claims "exclusive[ly] rel[y] on state law." *Caterpillar*, 482 U.S. at 392. As a result, Exxon

13

Mobil can establish federal-question jurisdiction only by demonstrating that Connecticut's suit falls within an exception to the well-pleaded complaint rule.

## 2. Defining Our Exceptions to the Well-Pleaded Complaint Rule

While there are "certain exceptions to [the well-pleaded complaint] rule," *Beneficial*, 539 U.S. at 6, our precedents make clear that they are tightly circumscribed. We have stated that exactly "*[t]hree* situations exist in which a complaint that does not allege a federal cause of action may nonetheless 'arise under' federal law for purposes of subject[-]matter jurisdiction." *Fracasse*, 747 F.3d at 144 (emphasis added; alteration omitted). They are: (1) "if Congress expressly provides, by statute, for removal of state[-]law claims"; (2) "if the state[-]law claims are completely preempted by federal law"; and (3) "in certain cases if the vindication of a state[-]law right necessarily turns on a question of federal law." *Id.* Here, Exxon Mobil urges that the three exceptions we enumerated in *Fracasse* are non-exhaustive. We disagree.

### a. The Artful-Pleading Doctrine

First, Exxon Mobil argues that "the artful-pleading doctrine" provides a broad, flexible exception from the well-pleaded complaint rule that extends beyond the bounds of the "the three situations identified in . . . *Fracasse*." Reply Br. at 12. That argument is squarely foreclosed by our precedents, which make

14

clear that the artful-pleading doctrine covers a *subset* of the exceptions encompassed by *Fracasse* – and not the other way around. As we explained in *Romano v. Kazacos*, "[t]he artful[-]pleading rule applies when Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that plaintiff cannot avoid removal by declining to plead 'necessary federal questions,' or (2) expressly provided for the removal of particular actions asserting state[-]law claims in state court." 609 F.3d 512, 519 (2d Cir. 2010) (quoting *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998)). Connecticut, then, is plainly right to observe that under *Romano*, the "two circumstances" that comprise the artful-pleading doctrine are simply, "in opposite order, the first and second exceptions articulated in *Fracasse*." Connecticut Br. at 16–17.

Nevertheless, Exxon Mobil persists in attempting to cast the artful-pleading doctrine in looser, more conceptually capacious terms than those we used in *Romano*. Such efforts are unavailing.

Principally, Exxon Mobil cherry-picks language from our decision in *NASDAQ OMX Group, Inc. v. UBS Secs., LLC*, 770 F.3d 1010 (2d Cir. 2014), to argue that the artful-pleading doctrine's scope is not limited to the "complete-preemption" and "special-removal-statutes" scenarios outlined in

15

*Romano*. Instead, Exxon Mobil argues, the gravamen of the doctrine is that "a court must look beyond the plaintiff's characterization of its claims and determine whether 'the real nature' of the complaint is 'federal,' even if the plaintiff is attempting to 'avoid federal jurisdiction by framing its claims in terms of state law.'" Exxon Mobil Br. at 27 (quoting *NASDAQ OMX*, 770 F.3d at 1019) (alterations omitted). But Exxon Mobil's view of the artful-pleading doctrine is foreclosed by binding precedent.

For starters, our decision in *NASDAQ OMX* repeatedly cited both *Fracasse* and *Romano* with approval, *see* 770 F.3d at 1018, 1019, 1020, 1024, 1027, which counsels strongly against reading it as either a repudiation of, or a departure from, the strict rules we laid down in those earlier cases. Indeed, *NASDAQ OMX* affirmatively supports the proposition that the outer boundaries of the artful-pleading doctrine lie *within* – not *beyond* – those of the three *Fracasse* exceptions. *See id.* at 1019 ("[E]*ven in the absence of artful pleading*, federal jurisdiction may properly be exercised over a 'special and small' category of actual state claims that present significant, disputed issues of federal law[, i.e., the third category identified in *Fracasse*]." (quoting *Gunn v. Minton*, 568 U.S. 251, 258 (2013)) (emphasis added). Finally, Exxon Mobil's preferred reading of *NASDAQ OMX*

16

cannot be squared with the Supreme Court's admonition that "[a]lthough" lower courts "occasionally" invoke the artful-pleading doctrine as authorizing a free-wheeling inquiry into "whether the real nature of the claim is federal, regardless of plaintiff's characterization, most of them *correctly* confine this practice to areas of the law" that are "completely pre[]empted" by "federal substantive law." *Caterpillar*, 482 U.S. at 393, 397 n.11 (emphasis added; citation and alteration omitted).

Unable to find support in *our* precedents for its broad view of the artful-pleading doctrine, Exxon Mobil turns to out-of-Circuit caselaw. Once again, its efforts are unsuccessful. For example, Exxon Mobil invokes the Sixth Circuit's decision in *Ohio ex rel. Skaggs v. Brunner*, 629 F.3d 527 (6th Cir. 2010), for the proposition that the "exceptions to the well-pleaded complaint rule" we recognized in *Romano* are not "the only situations in which the [artful-pleading] doctrine applies." Reply Br. at 12. But there, the Sixth Circuit merely stated that "'the artful[-]pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim,' or *perhaps* (it is not clear after *Rivet*) where federal issues necessarily must be resolved to address the state[-]law causes of action." *Brunner*, 629 F.3d at 532 (quoting *Rivet,* 522 U.S. at 475) (emphasis added;

17

alteration omitted). As a result, *Brunner* does nothing to advance Exxon Mobil's argument that the artful-pleading doctrine extends beyond the boundaries of the three *Fracasse* exceptions.

To the extent that *Brunner* definitively holds that the artful-pleading doctrine encompasses complete-preemption situations, it is fully consistent with *Romano*. *See Romano*, 609 F.3d at 519 ("The artful[-]pleading rule applies when Congress has . . . completely preempted, or entirely substituted, a federal[-]law cause of action for a state one."). Insofar as *Brunner*'s dicta suggests that "perhaps" the artful-pleading doctrine also provides an exception from the well-pleaded complaint rule "where federal issues necessarily must be resolved to address the state[-]law causes of action," 629 F.3d at 532, that exception is one of the three that we recognized in *Fracasse, see* 747 F.3d at 144 ("[A] complaint that does not allege a federal cause of action may nonetheless arise under federal law for purposes of [federal-question] jurisdiction . . . if the vindication of a state[-]law right necessarily turns on a question of federal law." (internal quotation marks and alteration omitted)). It is simply one that we have labeled as a *supplement* to the artful-pleading doctrine, *see NASDAQ OMX*, 770 F.3d at 1019, rather than a constituent part of it, *see Romano*, 609 F.3d at 518–19. Thus, any distinction between

18

what we have said in *Fracasse* and *Romano* and what the Sixth Circuit said in *Brunner* is a distinction without a difference.[1]  And "[i]n any event, our [C]ourt is not bound by the holdings – much less the dicta – of other federal courts of appeal."  *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 173–74 (2d Cir. 2012).

At bottom, we reaffirm what we said in *Romano*:  the "artful-pleading doctrine" is simply a label for the first two of the three exceptions to the well-pleaded complaint rule that we would later enumerate in *Fracasse*.  *Compare Fracasse*, 747 F.3d at 144 (laying out the three exceptions from the well-pleaded complaint rule), *with Romano*, 609 F.3d at 518–19 (defining the artful-pleading doctrine to comprise the first two exceptions laid out in *Fracasse*).  We are unpersuaded by Exxon Mobil's assertions to the contrary.

### b.  Federal Common Law

Next, Exxon Mobil suggests the existence of a *fourth* exception from the well-pleaded complaint rule, separate from the three we recognized in *Fracasse* (and thus, by extension, from the two we recognized as part of the artful-pleading

---

[1] It should come as no surprise that different circuits – in their "effort[s] to bring . . . order to th[e] unruly doctrine" governing the "special and small category of cases" subject to exceptions from the well-pleaded complaint rule, *Gunn*, 568 U.S. at 258 (internal quotation marks omitted) – have defined and classified those exceptions using slightly different labels and subgroupings.  But Exxon Mobil has never suggested that any legal significance attaches to whether we classify the "necessarily raised" exception as a constituent part of, or an external supplement to, the artful-pleading doctrine.

doctrine in *Romano*).  Exxon Mobil contends that under that putative exception, "a claim may arise under federal common law for purposes of federal jurisdiction even [though] the complaint does not explicitly invoke federal common law."  Reply Br. at 12.  We disagree.

Against the backdrop of Exxon Mobil's repeated "insist[ence] that its 'invocation of federal common law is *not* an argument for complete preemption,'" J. App'x at 225 (quoting Dist. Ct. Doc. No. 37 at 17 n.21) (alteration omitted), Exxon Mobil's argument for a "federal-common-law exception" would appear to hinge on the proposition that the well-pleaded complaint rule must yield not only in situations of "complete[] preempt[ion]," *Fracasse*, 747 F.3d at 144; *Romano*, 609 F.3d at 519, but also in certain situations of *ordinary* preemption.[2]  That proposition, however, is contrary to "settled law" dating back "since 1887."  *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 14 (1983).  Namely, while "[t]he artful[-]pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim," *Sullivan*, 424 F.3d at 272 (quoting *Rivet*, 522 U.S.

---

[2] "Complete preemption" – sometimes "labeled 'jurisdictional' preemption" – "is distinct from ordinary or 'defensive' preemption, which includes express, field, and conflict preemption." *Whitehurst v. 1199SEIU United Healthcare Workers E.*, 928 F.3d 201, 206 n.2 (2d Cir. 2019) (quoting *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 272 & n.5 (2d Cir. 2005)); *see Sullivan*, 424 F.3d at 272–73 (providing more detailed discussion of the distinction between complete and ordinary preemption).

at 475), the "Supreme Court has left no doubt . . . that . . . . 'a case may *not* be removed to federal court,'" *id.* at 273 (quoting *Caterpillar*, 482 U.S. at 393), "simply because the defendant may raise the defense of ordinary preemption," *id.* (citing *Caterpillar*, 482 U.S. at 393; *Franchise Tax Bd.*, 463 U.S. at 14). Thus, to the extent that Exxon Mobil's argument for a "federal-common-law exception" is really an invitation to find federal-question jurisdiction on the basis of ordinary preemption, we are bound to decline it.

But even if we take Exxon Mobil's argument at face value, it still fails. Principally, Exxon Mobil contends that "[t]his Court's decision in *Republic of Philippines* [*v. Marcos*, 806 F.2d 344 (2d Cir. 1986)] is illustrative" of a freestanding federal-common-law exception from the well-pleaded complaint rule. Exxon Mobil Br. at 24. On the contrary, our holding there was that when "the plaintiff pleads a state cause of action," its "'well-pleaded' complaint can be read in *one of two ways* to implicate federal law." *Republic of Philippines*, 806 F.2d at 354 (emphasis added). Those two exceptions from the well-pleaded complaint rule, respectively, were simply the "second" and "third" of the three exceptions we would later recognize in *Fracasse*. 747 F.3d at 144. Thus, when we discussed "federal common law" in *Republic of Philippines*, we did so exclusively in the context of assessing

21

whether "the federal common law . . . of foreign affairs" either (1) is "so powerful . . . as to" completely preempt a "state cause of action for conversion" that was "brought by a foreign government against its former head of state," or (2) was "raise[d] as a necessary element" of that state conversion claim, insofar as its adjudication would require deciding "whether to honor the request of a foreign government that the American courts enforce the foreign government's directives to freeze property in the United States." 806 F.2d at 354 (internal quotation marks omitted). We said nothing, however, to suggest the existence of a *freestanding* "federal-common-law exception" from the well-pleaded complaint rule.

Unable to rely on *Republic of Philippines*, Exxon Mobil points to three out-of-Circuit decisions – all decided long before the Supreme Court began its "effort[s] to bring some order to th[e] unruly doctrine" of exceptions to the well-pleaded complaint rule, *Gunn*, 568 U.S. at 258 – as evidence of a putative fourth category of exception. Once again, Exxon Mobil's efforts fall short.

One of those decisions, *Caudill v. Blue Cross & Blue Shield of N.C.*, 999 F.2d 74 (4th Cir. 1993), has been expressly abrogated by the Supreme Court. *See Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689 (2006).[3] Thus, it is no longer

---

[3] Exxon Mobil asserts that *Empire Healthchoice* "abrogated" *Caudill* "on other grounds" than those for which Exxon Mobil invokes it. Exxon Mobil Br. at 24 (italics omitted). We disagree. In *Caudill*,

22

good law in its own circuit – let alone in ours (or in any other circuit) – and we give it no weight.

The next, *In re Otter Tail Power Co.*, 116 F.3d 1207 (8th Cir. 1997), does not support Exxon Mobil's position at all. There, the Eighth Circuit explained that a "federal question is raised in those cases in which a well-pleaded complaint establishes either [1] that federal law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Id.* at 1213 (citation omitted). Full stop. That court went on to hold that because the plaintiff's state-law claims turned on the "enforce[ability]" of "a prior order of the [federal] district court" – which itself had turned on "the effects of a United States treaty, various federal statutes, *and* the federal common law of inherent tribal sovereignty" – they "necessarily present[ed] a federal question" sufficient to make removal proper. *Id.* at 1214 & n.6 (emphasis added). In sum, the presence of federal common law bore on the Eighth Circuit's

---

the Fourth Circuit held that "state[-]law claims under federal health insurance contracts" raise "federal[-]question jurisdiction" because they are "governed by 'federal common law' that displaces state law." 999 F.2d at 77. In *Empire Healthchoice*, the Supreme Court held that such claims do *not* raise federal-question jurisdiction, *see* 547 U.S. at 683, specifically identified *Caudill* among the lower-court decisions that had erroneously "uph[eld] federal jurisdiction" over such claims, *id.* at 689, and expressly rejected "the dissent's view" that "federal common law" "provides a basis for federal jurisdiction" over such claims – i.e., the very same "view" that the Fourth Circuit had endorsed in *Caudill* and Exxon Mobil now urges us to adopt, *id.* at 690 (internal quotation marks omitted).

23

jurisdictional analysis *only* to the extent that it was relevant to the question of whether "the vindication of a state[-]law right necessarily turns on a question of federal law" – a question already accounted for in the *Fracasse* framework that Exxon Mobil tries so desperately to resist. 747 F.3d at 144.

That leaves only *Sam L. Majors Jewelers* v. *ABX, Inc.*, 117 F.3d 922 (5th Cir. 1997). There, the Fifth Circuit found federal-question jurisdiction over a state-law "action seeking to recover damages against an airline for lost or damaged shipments," reasoning that "the federal common law . . . controls" such actions. *Id.* at 923. Notably, that court held that such an action may be said to "arise[] under federal common[-]law principles," allowing "jurisdiction [to] be asserted," *even though* the relevant "area of law" (airline regulation) was not "completely preempted by" federal common law (and/or federal statute). *Id.* at 924–25 (emphasis added). If taken at face value, that holding would seem to provide support for Exxon Mobil's view that in addition to *Fracasse*'s three enumerated exceptions from the well-pleaded complaint rule, there exists a distinct exception for actions that are, in some vague sense, "governed by federal common law." Exxon Mobil Br. at 11, 16, 20, 23, 26; Reply Br. at 8, 11.

24

But not even the Fifth Circuit panel that decided *Sam L. Majors Jewelers* took its own holding at face value. Instead, it took pains to "emphasize" that its "holding [was] necessarily limited" to the highly specific context of "cause[s] of action against an interstate air carrier for claim[s] for property lost or damaged in shipping." *Sam L. Majors Jewelers*, 117 F.3d at 929 n.16. And with good reason. The Fifth Circuit recognized that if its holding were *not* limited to that specific context – in which it could be explained by the unique "historical availability of [a federal] common[-]law remedy [for tort claims against airlines and other interstate carriers], and the statutory preservation of th[at] remedy" – it would have opened a "circuit split[]" on a rule of "national uniformity" and "vital importance." *Id.* Even setting aside the sui generis nature of *Sam L. Majors*, we are bound by our Circuit law and that of the Supreme Court, which has made clear that "a federal cause of action" must "completely preempt[] a state cause of action" in order to trigger the potent legal fiction that "any [state-law] complaint that comes within the scope of th[at] federal cause of action necessarily 'arises under' federal law." *Franchise Tax Bd.*, 463 U.S. at 24 (emphasis added); *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987) (cautioning that courts should "be reluctant to find that extraordinary pre[]emptive power," later referred to as complete

25

preemption, "that converts an ordinary state common[-]law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule"). We decline to disturb that rule today.

*       *       *

Finding ourselves wholly unpersuaded by Exxon Mobil's efforts to push the boundaries of the exceptions we recognized in *Fracasse* and *Romano*, we reaffirm what we said in those cases. There are three – and only three – exceptions to the "general rule" that "absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Beneficial*, 539 U.S. at 6. They apply (1) "if Congress expressly provides, by statute, for removal of state[-]law claims as it did," for example, in the federal-officer removal statute and OCSLA; (2) "if the state[-]law claims are completely preempted by federal law"; and (3) in "certain" circumstances, as outlined in *Gunn v. Minton, see* 568 U.S. at 258, "if the vindication of a state[-]law right necessarily turns on a question of federal law." *Fracasse*, 747 F.3d at 144. Under the law of this Circuit, the "artful-pleading doctrine" refers to nothing more and nothing less than the first and second of these exceptions. *See Romano*, 609 F.3d at 519.

26

**3.    Applying Our Exceptions to the Well-Pleaded Complaint Rule**

Having clarified the scope of the "three situations . . . in which a complaint that does not allege a federal cause of action may nonetheless 'arise under' federal law for purposes of subject[-]matter jurisdiction," we now turn to the question of whether any of those situations is present here. *Fracasse*, 747 F.3d at 144 (alteration omitted).

**a.  The Artful-Pleading Exceptions:  Special Removal Statutes and Complete Preemption**

Connecticut asserts that "Exxon[ ]Mobil [has] concede[d]" that "the first and second exceptions articulated in *Fracasse*," i.e., the two exceptions encompassed by the artful-pleading doctrine, "do not apply in this case."  Connecticut Br. at 16–17. That is half right.

On the one hand, Exxon has indeed "concede[d]" the inapplicability of the "second exception[] articulated in *Fracasse*."  *Id*.  That exception applies only "if [the removed complaint's] state[-]law claims are *completely* preempted by federal law," *Fracasse*, 747 F.3d at 144 (emphasis added), and in the proceedings below, Exxon Mobil "insist[ed] that its 'invocation of federal common law is *not* an argument for complete preemption,'" J. App'x at 225 (quoting Dist. Ct. Doc. No. 37 at 17 n.21 (Exxon Mobil's brief in opposition to Connecticut's motion to remand))

(alteration omitted). It is well-settled law that "litigants are bound by the concessions of freely retained counsel." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (internal quotation marks omitted).[4]

On the other hand, we disagree with Connecticut's assertion that "Exxon[ ]Mobil [has] concede[d]" that "the *first* . . . exception[] articulated in

___

[4] In turn, "the cardinal principle of judicial restraint – if it is not necessary to decide more, it is necessary not to decide more – counsels us" to refrain, *Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 124 (2d Cir. 2020) (citation omitted), from reaching out to address the now-purely-hypothetical "issue of whether federal common law can" *ever* "give rise to complete preemption" or otherwise "convert state claims into federal claims in the same manner as complete preemption under federal statutes," J. App'x at 225. To be sure, that question is an important one that calls out for resolution in this Circuit. For a time, our precedents had suggested that federal common law *can* have complete preemptive effect. *See, e.g.*, *Nordlicht v. N.Y. Tel. Co.*, 799 F.2d 859, 862 (2d Cir. 1986). Later, we issued two opinions seemingly suggesting that it cannot. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 53–54 (2d Cir. 1998); *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 486 (2d Cir. 1998). A little over two years ago, in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), we acknowledged that the question remains open to at least some extent in our Circuit. There, we held that actions bringing state-law tort claims "to recover damages for the harms caused by global greenhouse gas emissions" were "governed by federal common law" – but only for purposes of raising "an affirmative federal preemption defense" on a theory of *ordinary* preemption. *Id.* at 91, 94, 99 (citation and alteration omitted). In so holding, we took care to distinguish a "fleet of [recent, out-of-Circuit] cases" holding that federal common law "does not give rise to" *complete* preemption, for purposes of satisfying "the heightened standard unique to the removability inquiry." *Id.* at 94. We explained that, due to the distinction between complete (jurisdictional) preemption and ordinary (defensive) preemption, *see Sullivan*, 424 F.3d at 272–73, our holding would "not conflict with" these out-of-Circuit cases, "even if [they were] correct," *City of New York*, 993 F.3d at 94. But we reserved the question of whether they *were,* in fact, "correct" to hold that federal common law cannot give rise to complete, jurisdictional preemption. *Id.* If Exxon Mobil had not explicitly conceded that its "invocation of federal common law . . . is not an argument for complete preemption," Dist. Ct. Doc. No. 37 at 17 n.21, this case would squarely present the question we reserved in *City of New York*. But since Exxon Mobil *did* so concede, our resolution of that question – as important as it may be – will have to wait for another day.

28

*Fracasse*" is inapplicable here. Connecticut Br. at 16–17 (emphasis added). That exception applies "if Congress expressly provides, by statute, for removal of state law claims," *Fracasse*, 747 F.3d at 144 – or, to use the slightly more precise language of *Romano*, "when Congress has . . . expressly provided for the removal of *particular [types of] actions* asserting state[-]law claims in state court," 609 F.3d at 519 (emphasis added). The Supreme Court, for example, has held that the Price-Anderson Act, 42 U.S.C. § 2014(hh), presents an exception to the well-pleaded complaint rule because it "expressly provides for removal of [tort actions arising out of nuclear accidents] brought in state court even when they assert only state-law claims." *Beneficial*, 539 U.S. at 6. Throughout the course of this litigation, Exxon Mobil has argued that analogous provisions in the federal-officer removal statute and OCSLA are applicable to Connecticut's complaint here and thus provide independent bases for federal subject-matter jurisdiction and removal. These arguments were therefore preserved below and pressed on appeal, and are not waived, abandoned, or otherwise conceded. *See Bookings v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418–19 & n.4 (2d Cir. 2001).[5]

---

[5] Exxon Mobil invokes the federal-officer removal statute and OCSLA as "independent grounds for removal," Exxon Mobil Br. at 2 – that is, independent of ordinary federal-question jurisdiction under 28 U.S.C. § 1331. Accordingly, we address these ostensibly "independent grounds," *id.*, only after considering whether the federal-question jurisdiction lies under *Fracasse*'s third

### b. The *Grable*/*Gunn* Exception: "Necessarily Raised"

And so, whether Exxon Mobil properly removed this case under the federal-question statute boils down to whether Connecticut's pleading implicates the third exception identified in *Fracasse* as "a complaint that does not allege a federal cause of action [but] may nonetheless 'arise under' federal law for purposes of subject[-]matter jurisdiction" because the "vindication of [the] state[-]law right [asserted] necessarily turns on a question of federal law." 747 F.3d at 144 (alteration omitted). To determine whether Connecticut's pleading is among those "certain cases," *id.*, we apply the framework set forth by the Supreme Court in *Grable* and later streamlined in *Gunn*. Under that framework, "federal jurisdiction over a state[-]law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

As to whether Connecticut's "state-law claim[s] necessarily raise a . . . federal issue," *Grable*, 545 U.S. at 314, Exxon Mobil argues that "the first *Grable* prong is satisfied" because Connecticut's CUTPA claims "implicate[] the federal

---

exception from the well-pleaded complaint rule. *See infra* Sections IV.B, IV.C.

common law of transboundary pollution," Exxon Mobil Br. at 30–31.[6]  But that

misstates the inquiry.  For a "federal issue" to be "necessarily raised," *Gunn*, 568

U.S. at 258, the "mere *presence* of a federal issue in a state cause of action" is

insufficient; the pertinent "question of federal law" must be "a *necessary element* of

one of the well-pleaded state claims."  *City of Rome v. Verizon Commc'ns, Inc.*, 362

F.3d 168, 176 (2d Cir. 2004) (quoting *Merrell Dow*, 478 U.S. at 813) (emphasis

added).  A "state-law claim 'necessarily' raises federal questions where the claim

is affirmatively 'premised' on a violation of federal law."  *New York ex rel. Jacobson*

*v. Wells Fargo Nat'l Bank, N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) (quoting *Grable*, 545

U.S. at 314).  Conversely, if a "court could . . . resolve[] the case without reaching

the federal issues," then "the claims do not necessarily raise a federal issue."  *New*

*York v. Shinnecock Indian Nation*, 686 F.3d 133, 140–41 (2d Cir. 2012).

In light of that authority, Exxon Mobil cannot establish *Grable* jurisdiction

simply by gesturing toward ways in which "this case" loosely "implicates" the

---

[6] Exxon Mobil also contends that "[t]he first *Grable* prong is satisfied because" Connecticut's claims "threaten the 'careful balance' struck by the federal government 'between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other.'"  Exxon Mobil Br. at 30–31 (quoting *City of New York*, 993 F.3d at 93).  That contention is entirely irrelevant to our *Grable* analysis, since it "may [or may not] give rise to an affirmative federal preemption defense," but it certainly "is not grounds for federal jurisdiction."  *City of New York*, 993 F.3d at 94.

same subject matter as "the federal common law of transboundary pollution." *Exxon Mobil* Br. at 31. Rather, Exxon Mobil must point to a "necessary element" of proving liability under Connecticut's CUTPA claims, *City of Rome*, 362 F.3d at 176, that is "affirmatively premised on [Exxon Mobil's] violation of," *Wells Fargo*, 824 F.3d at 315 (internal quotation marks omitted) – and "could [not be] resolved . . . without" applying, *Shinnecock Indian Nation*, 686 F.3d at 140 – the federal common law of transboundary pollution.

Properly framed, then, our analysis of the first *Grable* prong must start by determining what exactly the "necessary element[s]" of Connecticut's "well-pleaded state claims" *are*. *City of Rome*, 362 F.3d at 176 (quoting *Merrell Dow*, 478 U.S. at 813). As noted above, the Connecticut Supreme Court has read two distinct causes of action into CUTPA – one for "decept[ion]," *Caldor*, 215 Conn. at 597, the other for "unfairness," *Ulbrich*, 310 Conn. at 409.

A CUTPA deception claim has three elements, all of which must be proven to establish liability: (1) "there must be a representation, omission, or other practice likely to mislead consumers"; (2) "the consumers must interpret the message reasonably under the circumstances"; and (3) "the misleading representation, omission, or practice must be material – that is, likely to affect

32

consumer decisions or conduct." *Caldor*, 215 Conn. at 597 (internal quotation marks omitted).

Here, Connecticut's deception claims center around the allegation that Exxon Mobil has engaged "[f]or several decades" in a "campaign of deception" that "has misled and deceived Connecticut consumers about the negative effects of its business practices on the climate." J. App'x at 8. Thus, Connecticut pleads the elements of its CUTPA deception claims by alleging that Exxon Mobil's "campaign" entailed (1) "false" "representations" and "deceptive omissions" that were "likely to mislead consumers," and that "Connecticut consumers" (2) "reasonably" and (3) "material[ly]" relied on such representations in purchasing "more oil and gasoline than [they] would have purchased had the reality of climate change been disclosed." *Id.* at 8–9, 43–44. Since all three of these allegations must be proven to establish Exxon Mobil's liability for deception under CUTPA, *see Caldor*, 215 Conn. at 597, each constitutes a "necessary element" for purposes of our *Grable* analysis, *City of Rome*, 362 F.3d at 176.

Meanwhile, the sole "element" of a CUTPA unfairness claim is that "a [trade] practice is unfair." *Ulbrich*, 310 Conn. at 409 (citation omitted). That element may be pleaded by alleging any combination of "three criteria," which

33

need not "[a]ll . . . be satisfied to support a finding of unfairness." *Id.* (citation omitted). Those criteria are "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers, competitors[,] or other businesspersons." *Id.* (citation and alterations omitted). "A practice may be unfair" *either* "because of the degree to which it meets one of the criteria *or* because[,] to a lesser extent[,] it meets all three." *Id.* (emphasis added; citation omitted).

Here, Connecticut's unfairness claims center around the same alleged "campaign of deception" as its deception claims. J. App'x at 8. Thus, Connecticut alleges that Exxon Mobil's allegedly "false and/or misleading statements about its business practices and their environmental impact," *id.* at 47, were "unfair" insofar as they *either* (1) were "in contravention of Connecticut's public polic[ies]" of "promoting truth in advertising" and "protect[ing] its natural resources and environment and . . . control[ling] . . . pollution in order to enhance the health,

34

safety[,] and welfare of the people of the [S]tate," J. App'x at 46 ¶¶ 189–90 (quoting

Conn. Gen. Stat. § 22a-1); (2) were inherently "immoral, unethical, oppressive[,]

and/or unscrupulous," *id.* at 46 ¶ 191; *and/or* (3) "caused substantial injury to

consumers within the State of Connecticut" by "stifling . . . an open marketplace

for renewable energy," *id.* at 46 ¶ 193.

Since these three subsidiary allegations need not "[a]ll . . . be [proven] to

support a finding of unfairness," *Ulbrich*, 310 Conn. at 409, Connecticut's

unfairness claims "*could* [be] resolved . . . without" adjudicating any given one of

them, *Shinnecock Indian Nation*, 686 F.3d at 140 (emphasis added). Thus, none may

be counted as a "necessary element" for purposes of our *Grable* analysis. *City of

Rome*, 362 F.3d at 176. And as a result, if we determine that any one of these

allegations could potentially support a showing of unfairness without raising a

federal issue, the rest will drop out from our *Grable* analysis.

With that established, the remainder of our federal-question analysis

proceeds straightforwardly. Each of the three necessary elements of Connecticut's

deception claim is one that a "court could . . . resolve[] . . . without reaching" the

federal common law of transboundary pollution. *Shinnecock Indian Nation*, 686

F.3d at 140. We entirely agree with the district court's analysis of this point:

"Connecticut alleges that ExxonMobil lied to Connecticut consumers, and that these lies affected the behavior of those consumers. The fact that the alleged lies were *about* the impacts of fossil fuels on the Earth's climate" is immaterial. J. App'x at 223–24.

Analyzing the unfairness claim is not much harder. In their briefing, the parties vigorously dispute whether federal pollution law is necessarily raised by Connecticut's allegation that Exxon Mobil's relevant public statements and omissions

> [w]ere in contravention of Connecticut's public policy . . . that "human activity must be guided by and in harmony with the system of relationships among the elements of nature[;] [and that] the policy of the [S]tate of Connecticut is to conserve, improve[,] and protect its natural resources and environment and to control air, land, and water pollution in order to enhance the health, safety[,] and welfare of the people of the [S]tate."

*Id.* at 46 ¶ 189 (quoting Conn. Gen. Stat. § 22a-1).

But we easily conclude that *other* allegations that Connecticut made in support of a showing of unfairness – most obviously, its allegation that Exxon Mobil's statements and omissions "were in contravention of Connecticut's public policy" of "promoting truth in advertising," *id.* at 46 ¶ 190 – have absolutely nothing to do with "the federal common law of transboundary pollution," Exxon

36

Mobil Br. at 31.  Thus, Connecticut's unfairness claims, like its deception claims, "could [be] resolved . . . without reaching [any] federal issue[]."  *Shinnecock Indian Nation*, 686 F.3d at 140.

Because no "federal issue is . . . necessarily raised" by any of Connecticut's CUTPA claims, the *Grable/Gunn* exception from the well-pleaded complaint rule is inapplicable here.  *Gunn*, 568 U.S. at 258; *see also Grable*, 545 U.S. at 313–14.  We therefore affirm the district court's conclusion that it lacked federal-question jurisdiction over this action.

## B.    Federal-Officer Removal Jurisdiction

Unable to establish federal-question jurisdiction, Exxon Mobil turns to the federal-officer removal statute, which provides for removal jurisdiction over civil actions commenced against "any officer (or person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  Because Exxon Mobil is not itself a federal officer, it "must satisfy a three-pronged test to determine whether [it] may effect removal" on those grounds.  *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008).  Exxon Mobil must (1) show that it is a "'person' within the meaning of the statute who 'acted under a federal officer,'" (2) show that it "performed the actions for which [it is] being sued 'under color of federal office,'" and (3) "raise a

37

colorable federal defense."  *Id.* (quoting 28 U.S.C. § 1442(a)(1); citing *Jefferson County v. Acker,* 527 U.S. 423, 431 (1999)) (alterations omitted).  The first two of these prongs "tend to collapse into a single requirement:  that *the acts that form the basis for the state civil . . . suit* were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations."  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (emphasis added; internal quotation marks omitted).

Here, Exxon Mobil argues that it is entitled to invoke federal-officer removal jurisdiction based on two categories of its current and historical business dealings with the federal government.  Neither argument is convincing.

First, Exxon Mobil notes that it leases oil drilling sites from the federal government on the outer continental shelf, and that "pursuant to" these leases, it "has been subject to myriad federal government requirements" and, pursuant to its role as an "operator and lessee of the Strategic Petroleum Reserve Infrastructure," it has been "required to pay royalties in kind to the federal government."  Exxon Mobil Br. at 39–40.  Exxon Mobil has made this very argument to five of our sister circuits, all of which have squarely rejected it.  *See Rhode Island v. Shell Oil Prod. Co. ("Rhode Island I")*, 979 F.3d 50, 59–60 (1st Cir. 2020),

*vacated on other grounds*, 141 S. Ct. 2666 (2021); *Rhode Island v. Shell Oil Prod. Co.* *("Rhode Island II")*, 35 F.4th 44, 53 n.6 (1st Cir. 2022) (reinstating *Rhode Island I*'s analysis in relevant part); *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 712–13 (3d Cir. 2022); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 231–34 (4th Cir. 2022); *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 759–60 (9th Cir. 2022); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1250–54 (10th Cir. 2022). We find their reasoning persuasive, and we now join them.

"At most, the leases appear to represent arms-length commercial transactions whereby Exxon[ ]Mobil agreed to certain terms . . . in exchange for the right to use government-owned land for their own commercial purposes." *Mayor & City Council of Baltimore*, 31 F.4th at 232 (citation omitted). But as one of our sister circuits has explained, "a person is not" – and cannot be – "'acting under' a federal officer when the person [merely] enters into an arm's-length business arrangement with the federal government." *County of San Mateo*, 32 F.4th at 757. We agree. A "private person's 'acting under' [a federal officer] must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," and such a "relationship typically involves subjection, guidance, or control." *Watson*

39

*v. Philip Morris Cos.*, 551 U.S. 142, 151–52 (2007) (internal quotation marks omitted). "[W]e are skeptical that the willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more, could ever be characterized as the type of assistance that is required to trigger the government-contractor analogy." *Mayor & City Council of Baltimore*, 31 F.4th at 232. And in cases where courts *have* found private contractors to be "acting under" federal direction, the key distinguishing factor has been that "the private contractor in such cases is helping the [g]overnment to produce an item that it needs." *Watson*, 551 U.S. at 153. Here, "[t]hough the federal government grants the [outer continental shelf] leases, oil produced under them is produced to sell on the open market, not specifically for the government." *City of Hoboken*, 45 F.4th at 713 (internal quotation marks omitted). Thus, Exxon Mobil's argument based on its leases of government land fails at the first *Isaacson* prong.

Next, Exxon Mobil argues that it "has contributed significantly to the United States military by providing fossil fuels that support the national defense." Exxon Mobil Br. at 38. But the mere fact that Exxon Mobil "help[s] the [g]overnment to produce an item that it needs" is not enough; it must also show that in providing fossil fuels to the military it acts under the "close supervision," "subjection,

40

guidance, or control" of federal officers.  *Watson*, 551 U.S. at 151, 153 (internal quotation marks omitted).  In attempting to establish such "close supervision," *id.* at 153, Exxon Mobil focuses extensively (indeed, almost exclusively) on examples of the "significant control over the means of [oil and gas] production," including over Exxon Mobil's predecessor companies, that "the United States government exercised" during World War II, J. App'x at 87 (citation omitted).  But World War II ended in 1945, and here, the conduct alleged in Connecticut's complaint dates back no earlier than the 1950s.  We are aware of no authority for the proposition that once a private company has acted under the close supervision of the federal government for some discrete period in its history, it may claim "acting-under" status for the rest of time.  On the contrary, when Exxon Mobil recently made similar arguments regarding "the federal government's relationship with the oil industry during World War II," the Fifth Circuit flatly rejected them.  *Plaquemines Par. v. Chevron USA, Inc.*, No. 22-30055, 2022 WL 9914869, at *1 (5th Cir. Oct. 17, 2022).

That leaves only Exxon Mobil's bald and passing assertion that "to this day, [it] supplies fossil-fuel products to the military under exacting specifications established by the federal government."  Exxon Mobil Br. at 39 (citing J. App'x at

41

89).  But while Exxon Mobil has put forth record evidence of the significant *volume* of fossil fuels that it still provides to the military each year, the record contains no indication of the degree of "supervision" or "control" that the federal government exerts over Exxon Mobil's production of such fuels, *Watson*, 551 U.S. at 151, 153. That is fatal for Exxon Mobil, which bears the "burden of providing 'candid, specific and positive' allegations that [it was] acting under federal officers when" its alleged campaign of deception was underway.  *In re MTBE*, 488 F.3d at 130 (quoting *Willingham v. Morgan*, 395 U.S. 402, 408 (1969)).

But even if we took Exxon Mobil at its word and assumed, arguendo, that it could satisfy the first *Isaacson* prong by virtue of its contracts to supply fuel to the military, it would clearly fail the second prong.  Exxon Mobil cites the Seventh Circuit's decision in *Betzner* v. *Boeing Co.* for the proposition that the "level of federal control" exerted over military suppliers "suffices to constitute direction." Exxon Mobil Br. at 39 (citing 910 F.3d 1010, 1015 (7th Cir. 2018)).  But in *Betzner*, the court explained that "the 'acting under the color of federal authority' requirement . . . is distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage – there must be a 'causal connection between the

charged conduct and asserted official authority.'" 910 F.3d at 1015 (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999)) (other internal quotation marks omitted). The court went on to find that the defendant – a manufacturer and supplier of military aircraft, seeking to remove a former employee's mesothelioma-related tort claims – "ha[d] sufficiently stated a causal connection between the [plaintiff's] negligence claims and its official actions controlled by the military," *because* Boeing's factory "was under the sole direction of the United States Air Force when it manufactured the B-1 and B-1B Lancer aircraft that allegedly caused [the plaintiff's] asbestos-related illnesses." *Id.*

Here, by contrast, there is no such causal nexus between Exxon Mobil's claimed role as a military supplier and the alleged "campaign of deception" that forms the basis of Connecticut's CUTPA claims. For starters, Exxon Mobil can hardly claim that it "was under the sole direction of" the military at any point between 1957 and the present. *Id.*; *see City of Hoboken*, 45 F.4th at 713 (crediting amicus scientist's "estimate[] that the Department of Defense is responsible for less than 1/800th of the world's energy consumption" and rejecting invitation of defendants, including Exxon Mobil, "to hang our jurisdiction on so small a slice of the pie"). Even more fundamentally, this case presents a total mismatch between

43

the business practices that Exxon Mobil asserts were subject to federal control and supervision (its actual production of fossil fuels) and the business practices of which Connecticut complains (its marketing and public-relations campaigns to assuage consumers' fears about the environmental impacts of those fossil fuels). Thus, Exxon Mobil cannot establish that it "performed the actions for which [it is] being sued 'under color of federal office,'" *Isaacson*, 517 F.3d at 135 (quoting 28 U.S.C. § 1442(a)(1)) (alteration omitted) – i.e., that "the acts that form the basis for [Connecticut's] suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations," *In re MTBE*, 488 F.3d at 124 (internal quotation marks omitted).[7] And so at bottom, Exxon Mobil cannot invoke federal-officer removal jurisdiction over Connecticut's CUTPA claims in this action, regardless of whether it attempts to do so by focusing on its status as a

---

[7] We reject Exxon Mobil's efforts to resist this conclusion by asserting that the causal-nexus requirement recognized in pre-2011 cases like *Isaacson* and *In re MTBE* was abrogated by the Removal Clarification Act of 2011. *See* Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (amending the federal-officer removal statute to refer to defendants sued "for *or relating to* any act under color of [federal] office," *id.* (emphasis added), where it had previously referred only to defendants sued "*for* any act under color of such office," 28 U.S.C. § 1442(a) (2006) (emphasis added)). In fact, we have continued to apply the casual-nexus requirement in our binding and precedential opinions long after 2011 – and indeed, as recently as just last year. *See, e.g., Agyin*, 986 F.3d at 179 (finding sufficient nexus where defendant's "*challenged conduct* was directed by federal regulation and he was acting under a federal officer" (emphasis added)).

44

lessee and tenant of the Department of Interior or as a supplier to the Department of Defense.

## C.    OCSLA Jurisdiction

In a final effort to establish the removability of Connecticut's action, Exxon Mobil invokes OCSLA, which provides for federal jurisdiction over actions "arising out of, or in connection with . . . any operation conducted on the outer [c]ontinental [s]helf [that] involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer [c]ontinental [s]helf, or [that] involves rights to such minerals."  43 U.S.C. § 1349(b)(1)(A).  Exxon Mobil states that it "indisputably engages in significant 'operation[s]' on the outer continental shelf," where its drilling sites "were collectively responsible for producing 690 million barrels of oil and 1.034 trillion cubic feet of natural gas in 2019 alone." Exxon Mobil Br. at 45 (alteration in original).  Exxon Mobil argues that Connecticut's "claims arise in part from" these "operations," insofar as its complaint included a background factual allegation that Exxon Mobil "has contributed to climate change by causing the sale of fossil[-]fuel and petroleum products[] in Connecticut and elsewhere," and a prayer for discretionary relief in the form of restitution for "all expenditures attributable to [Exxon Mobil] that the

State has made and will have to make to combat the effects of climate change." *Id.* (quoting J. App'x at 11, 51).

This argument brings us back to ground well-trodden by our sister circuits. Exxon Mobil has made virtually the same argument to five other courts of appeals, all of which have rejected it. *See Rhode Island II*, 35 F.4th at 59–60; *City of Hoboken*, 45 F.4th at 709–12; *Mayor & City Council of Baltimore*, 31 F.4th at 219–22; *County of San Mateo*, 32 F.4th at 751–55; *Bd. of Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th at 1272–75. In that respect, too, we now join them.

The critical question here is whether Connecticut's CUTPA claims "aris[e] . . . in connection with" Exxon Mobil's "operations" extracting oil and gas on the OCS. 43 U.S.C. § 1349(b)(1)(A). To be sure, our sister circuits are not in perfect agreement regarding how to interpret the statutory phrase, "in connection with." The Fourth and Tenth Circuits have construed that phrase to require a but-for causal link between a plaintiff's claims and a defendant's operations on the OCS. *See Mayor & City Council of Baltimore*, 31 F.4th at 220; *Bd. of Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th at 1272–75; *see also In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (holding same, albeit in a different context). Those circuits therefore held that since Exxon Mobil and its co-defendants had "concede[d] that some of

46

their fossil-fuel production occurred outside of the OCS," and the respective plaintiffs' "injuries remain even after we disregard 'whatever slice' of Defendants' fossil-fuel production occurred on the OCS," there could be no "but-for connection satisfying . . . OCSLA's jurisdictional grant." *Mayor & City Council of Baltimore*, 31 F.4th at 221 (4th Cir. 2022) (citing *Cnty. Comm'rs of Boulder Cnty.*, 25 F.4th at 1272–75).

The Third and Ninth Circuits, meanwhile, have held "that the language of [section] 1349(b), 'aris[e] out of, or in connection with,' does not necessarily require but-for causation," *County of San Mateo*, 32 F.4th at 754 (second alteration in original), and instead asked, "do the lawsuits here target actions on or closely connected to the Shelf?" *City of Hoboken*, 45 F.4th at 712. These circuits nonetheless answered that question in the negative, reasoning that plaintiffs' common-law trespass, nuisance, and misrepresentation claims were "all too far away from Shelf oil production" because "the carbon emissions they deplore come not from extracting oil and gas, but burning them: driving cars, heating houses, fueling machinery." *Id.*

We, meanwhile, join the First Circuit in concluding that "we need not wrestle the but-for-causation issue to the ground today," because "despite the[ir]

47

different approaches to construing [section] 1349(b), our sister circuits' [unified] *application* of [section] 1349(b) leads to a materially similar result" in the case before us. *Rhode Island II*, 35 F.4th at 59–60 (emphasis added; citation and alterations omitted). Even under the Third Circuit's looser construction of the phrase "in connection with," Exxon Mobil still could not establish OCSLA jurisdiction here, because Connecticut's claims still would be "too many steps removed from [Exxon Mobil's] operations on the Shelf." *City of Hoboken*, 45 F.4th at 712.

In fact, Connecticut's CUTPA claims are an additional step *further* removed from those "operations" than was the case in *City of Hoboken*. There, the court explained that the plaintiffs' attempts "to cast their suits as just about misrepresentations" were "belie[d]" by "their own complaints," which "charge[d] the oil companies with not just misrepresentations, but also trespasses and nuisances" allegedly "caused by burning fossil fuels and emitting carbon dioxide." *Id.* But here, as we have explained, *see supra* Section IV.A.3.b, Connecticut *can* accurately "cast [its] suit[] as just about misrepresentations," *City of Hoboken*, 45 F.4th at 712. Connecticut's claims, then, ultimately concern neither "extracting oil and gas" *nor* "burning them," *id.*, but *talking about what happens to the environment when they are burned*. Thus, under any standard we might apply, it is plain that

48

Connecticut's suit does not "aris[e] . . . in connection with," 43 U.S.C. § 1349(b)(1)(A), Exxon Mobil's "operations" extracting oil and gas on the outer continental shelf and cannot trigger federal jurisdiction under OCSLA.

## V.    Conclusion

For the foregoing reasons, we **AFFIRM** the district court's order remanding this case to the Connecticut Superior Court for the District of Hartford.